ROBIN EXPRESS TRANSFER, INC. *v.*
CANTON RAILROAD COMPANY

[No. 467, September Term, 1974.]

*Decided May 28, 1975.*

The cause was argued before MOORE, LOWE and MELVIN, JJ.

*Stanley B. Rohd,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*Robert L. Ferguson, Jr.,* with whom were *Donald C. Allen* and *Allen, Thieblot & Alexander* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This appeal arises out of a collision which occurred at approximately 4 a.m. on September 29, 1972 at a railroad crossing on North Point Boulevard in Baltimore County, involving a locomotive owned by appellee, Canton Railroad Company (Canton), and a tractor-trailer owned and operated by appellant, Robin Express Transfer, Inc. (Robin). Canton filed suit against Robin based upon negligence in the truck's alleged failure to stop for a red traffic signal. Robin filed a counter-claim against Canton alleging that the railroad was negligent in failing to maintain the automatic signals in properly functioning condition. The case was submitted to a jury in the Circuit Court for Baltimore County (Raine, J., presiding) on two issues calling for a determination of whether there was negligence on the part of Canton or Robin, or both.[1] The jury found that both parties were

---

1. The parties stipulated that the damages to the locomotive were $6,293.55 and to the tractor trailer $9,875.00. The record is silent concerning any claims by railroad personnel for personal injuries or claims in connection with the instant death of the driver of the tractor-trailer.

guilty of negligence contributing to the happening of the accident. A motion by Robin for a new trial was denied. The trial court, however, granted Canton's motion for judgment *n.o.v.*, entering judgment in favor of Canton for $6,293.55 on its own claim and also in favor of Canton on Robin's counterclaim. From this judgment Robin appeals, seeking a reversal and reinstatement of the original jury verdict.

I

The accident occurred at a point where Canton's single track railroad, running east and west, intersected with North Point Boulevard (State Route 151), a major traffic artery consisting of two northbound and two southbound lanes separated by a 34 foot wide grass median. The posted speed limit was 55 miles per hour. At the intersection of the highway and the track there were two crossarm signals.[2] There were also yellow and black railroad crossing signs located on North Point Boulevard approximately 300 feet north and south of the crossing. The most important signal system, however, and the focal point of Robin's allegations of negligence, consisted of four automatic traffic signals, one over each northbound and southbound lane of traffic, controlled by an electrically wired system connected to the railroad tracks.

These traffic signals were designed to remain green for vehicular traffic on the Boulevard and change from green to yellow to red when a train approached the crossing from either direction; and to stay red until the entire train had proceeded completely beyond the intersection. Three fully independent, battery-powered circuits controlled three separate sections of the railroad track circuit 1T controlled that part of the track between a point about 220 feet west of the highway and a point about 26 feet west of the highway; circuit 3T controlled a like section of track east of the highway; circuit 2T spanned the area from 26 feet from the edge of the road on either side of the intersection, including

---

2. Flashing devices on these signals had not been in use for some 6 or 7 months. No question of negligence has been raised by appellant in connection with the abandonment of their use.

324

the entire part of the track crossing the north and south roadbeds of the Boulevard.

When a train approached from the west it would, at a point about 220 feet from the first southbound lane of the road, complete the circuit (1T) by contact with the rails which were wired to a battery. The battery well was located approximately 10 feet from the tracks with wires running underground and emerging at the tracks in an electrical connection. By shorting the circuit the train activated the four traffic signals to change from green to yellow to red. Simultaneously with the traffic signal turning red, the circuit activated a separate signal — visible only to the train and located on a pole about 20-30 feet from the intersection — causing it to change from red to green, thereby indicating to the train engineer that it was safe to enter the intersection.

This process whereby the highway traffic signal turned red (and the train signal turned green) took approximately 5 seconds from the train's first contact with the wired track, according to testimony by Canton's mechanic.

Finally, as a safety measure, the system was so designed that if a battery went dead or lost its voltage the system would "fail-safe" by causing the vehicular traffic signals to turn red and remain red. This had been observed to happen occasionally in the past.

Just before the accident the Canton train, pulling nine freight cars, was proceeding eastward toward the intersection with North Point Boulevard, as it did about three times a week. It had rained previously and the weather was still "misty" but the engineer said that visibility was good. As the train approached the road the engineer testified that he sounded the bell (air operated) when he was 50 to 60 feet away from the road, that the bell remained on continuously and that the horn was blasting up to the time of impact. The double headlights were on, mounted on the top part of the locomotive and affording illumination "at least a half a block." In addition, the locomotive's "ground lights" were operating which "shine down to the ground and takes and shows [sic] the whole lower part of your locomotive."

The engineer also testified that he noticed that the signal light for the train was red and did not turn green until the train was 10-15 feet from the signal pole, or about 30-40 feet from the road.[3] The train was at that point traveling at 2-3 m.p.h.

When the signal light turned green the engineer said that he also saw, by the reflected light, the Boulevard traffic signal turn from green to yellow to red. At that time he began to release the brake and the train accelerated somewhat to about 4 m.p.h. as it reached the road.

In the meantime, the tractor-trailer, proceeding northbound from Sparrows Point toward Baltimore in the inside lane, was also approaching the intersection and its headlights were seen by the engineer and his helper in the cab of the locomotive. The truck was then "several hundred feet away" and they assumed it would stop. The truck continued, however, and collided with the 250,000 pound locomotive in the last northbound lane of the Boulevard. The engineer and his helper described it as a "terrible impact" which "raised up" the cab, throwing the crewmen to the floor. When the engineer arose, he threw the emergency brake, stopping the train about 168 feet east of the point of impact. The helper estimated that at the time of impact the train was going 10-12 m.p.h. There was no testimony as to the truck's speed but the investigating officer, William Pulaski of the Baltimore County Police Department, called as a witness by Robin, testified that there were no skid marks. The driver of the truck was fatally injured and the only eyewitness testimony of the collision came from the train crewmen.

Officer Pulaski testified that he arrived on the scene at 4:07 a.m., approximately seven minutes after the accident. The traffic lights governing vehicular traffic were red. He

---

3. If the train had shorted the circuit when it first came into circuit 1T (about 220 ft. west of the road) it would have been about 190 feet from the road when the train signal light turned green (assuming a speed of 4 m.p.h. — 6 ft. per sec.) because the train would have traveled about 30 feet in the 5 seconds it took for the lights to change (220-30=190). This contrasts with the 30-40 feet from the road which the crewmen indicated was the distance when the lights did change.

gave the dimensions of the median, the traffic lanes and shoulders as 34 feet, 12 feet and 8 to 10 feet, respectively. Over Robin's objection, he was permitted to testify on cross-examination, that in making his initial report he found no improper action on the part of the railroad and that the cause of the accident was the violation of the traffic signal by the tractor-trailer operator.

Over Canton's objection, the police officer was also permitted to testify on direct examination concerning observations made by him of an apparent malfunction of the traffic control system, some eight hours after the accident, at the end of his tour of duty. As he was driving northbound on North Point Boulevard he observed a train coming in the same direction (from west to east) as the train involved in the collision. He stopped his car in the median to watch the operation of the traffic signals. As the train came close to the Boulevard, the vehicular traffic signals remained green. The train stopped and let off a flagman. The officer got out of his car and, along with the flagman, stopped the automobile traffic on the Boulevard. The officer testified that "as the train passed and cleared the northbound lanes of Route 151, North Point Boulevard, it went approximately 250 feet and hit the switch on the west [sic] side of the roadway before the light changed red for the traffic on North Point Boulevard."

The trial judge, in his memorandum opinion granting Canton's motion for judgment *n.o.v.*, stated that this testimony of the police officer was "the only evidence to suggest that the light was not properly functioning at the time of the collision" but that it should *not* have been admitted.[4] It was held:

> "The Court believes that the condition of the automatic signal system is of a transitory or changeable nature, and that the condition of the signal seven or eight hours after the accident is

---

4. As noted *infra*, appellant challenges the finding of the trial court that the officer's testimony was the "only evidence" of a malfunction of the system.

*circumstantial and too speculative, and should not have been admitted.* At best it amounted to a mere suggestion that a wire might have become disconnected that ran from the battery well to the track. The uncontradicted evidence is that whenever a battery dies or loses its voltage the automatic traffic signal is designed to cause the light for vehicular traffic to remain red, and the only prior complaints about the traffic signal system not functioning properly concerned traffic being held up by a red light when no train was in the area. *It is far more rational to conclude that the subsequent malfunction that the officer observed was caused in some manner by the impact on the locomotive and the tracks, rather than to infer that the system was malfunctioning at the time of the accident.* This is particularly true when you consider the officer's testimony that when he first arrived on the scene the light was red when the locomotive had not yet reached the point where the officer observed the light turn red at the later observation." (Emphasis added.)

## II

The ultimate question for our determination on this appeal is whether the trial court erred in granting Canton's motion for judgment *n.o.v.*[5] The settled rule is that in our appellate review of the trial court's action we must assume the truth of all credible evidence and of all inferences fairly deducible therefrom and consider the same in the light most favorable to the party against whom the motion is made; and if such evidence and inferences lead to conclusions with which reasonable minds could not differ, then the issue is one of law for the court and not one of fact for the jury.

---

5. A written motion by Canton for a directed verdict at the conclusion of all the evidence, Md. Rule 552, was formally denied by the trial judge. A motion for judgment *n.o.v.* was thereafter timely filed. Md. Rule 563. The trial court is governed by the same consideration in determining a motion for a directed verdict as it is in determining a motion for judgment *n.o.v.* Miller v. Michalek, *infra.*

*Newton v. Spence,* 20 Md. App. 126, 316 A. 2d 837 (1974); *Montgomery Ward & Co. v. McFarland,* 21 Md. App. 501, 319 A. 2d 824 (1974); *Miller v. Michalek,* 13 Md. App. 16, 281 A. 2d 117 (1971), citing *Belleson v. Klohr,* 257 Md. 642, 646, 264 A. 2d 274 (1970).

The police officer's testimony concerning the malfunctioning of the traffic signals eight hours after the collision is a classic illustration of circumstantial evidence. From such evidence, Robin urges that the jury might legitimately infer a system disorder at the time of the accident, probative on the issue of Canton's alleged negligence. It contends that the circumstantial evidence was properly submitted to the jury and, in effect, improperly withdrawn from the jury upon the granting of the motion for judgment *n.o.v.*

This argument, however, betrays a fundamental misconception of the respective functions of court and jury where the sufficiency of circumstantial evidence is involved. *See* generally, *Harper and James on Torts,* Vol. 2, §§ 19.3, 19.4. It is the function of the court, in the first instance, to decide whether the inference of negligence is legitimate or permissible. If the decision is "no" the evidence should be withheld from the jury. Contrariwise, if the decision is "yes," the evidence should be submitted to the jury for its evaluation of the force of the inference of negligence. This is so because, as Horney, J. observed in *Short v. Wells,* 249 Md. 491, 240 A. 2d 224 (1968), "The value of circumstantial evidence depends on the strength and genuineness of the inferences to be drawn therefrom." The fundamental difference in the functions of the court and jury and the test for determining whether the evidence should be submitted to the jury are in *Short v. Wells,* succinctly defined (pp. 495-6):

> "The court makes the initial determination on the basis of whether the inference of negligence, *as a generalization,* is more probable than not,"

Then, if the court "decides that the inference is permissible"

> "[I]t should submit the evidence to the jury to

finally determine whether the inference of negligence is more probable than not *in that particular case.*" (Emphasis in original.)

Similarly, in *Prosser on Torts*, 4th Ed., p. 212, the author explains:

> "The inference must cover all of the necessary elements of negligence, and must point to a breach of the defendant's duty. The mere fact of the presence of a banana peel on a floor may not be sufficient to show that it has been there long enough for reasonable care to require the defendant to discover and remove it; but if it is 'black, flattened out and gritty,' the conclusion may reasonably be drawn. It is for the court to determine, in the first instance, whether reasonable men on the jury may draw it."

Accordingly, we must reject appellant's contention that the trial court in the instant case invaded the province of the jury. We think the court correctly characterized as "circumstantial" the condition of the signal approximately eight hours after the accident; and that when the court stated "it is far more rational" to conclude that the malfunction observed by the officer was caused in some manner by the impact, it was effectively deciding in the negative the question of whether the inference of negligence was more probable than not. This constituted the exercise of a proper judicial function. The decision was amply supported.[6]

---

**6.** The malfunction observed 8 hours after the accident was that the train did not activate the traffic lights to turn red until it was already through the intersection and approximately 250 feet east of the Boulevard. Just before the accident, however, both crewmen saw the traffic signal go red for the cars when the train still was 30-40 feet away from the road. This is corroborated to some extent by Officer Pulaski's testimony that on arriving at the scene of the accident the light was red for North Point Boulevard and the train was 168 feet east of the intersection. There is a substantial distance between the point where the train was located when the traffic light turned red on the morning of the accident and its location when the light turned red as observed by the officer 8 hours later. This difference led the trial court to conclude that the malfunction observed 8 hours later was caused by a system defect attributable to the

Furthermore, we find misplaced appellant's reliance upon *Stitzel v. Kurz*, 18 Md. App. 525, 308 A. 2d 430 (1973). This was a one-car accident case wherein the parents of a deceased passenger brought suit against the driver and against Baltimore County. The basis for a claim of negligence against the County was that it had erected an incorrect road sign which had misled or confused the driver. The sign, as originally erected on May 1, 1970, showed a curve in a direction opposite to the direction of the actual curve. This Court, in an opinion by Judge Powers, held that the trial court erred in directing a verdict for the County. We stated (p. 538):

> "When it is shown that a condition existed at a certain time, and the condition is one which by its nature is relatively permanent, rather than transitory or changeable, it is rational to infer that the same condition existed before and after the time shown, for a length of time reasonably consistent with the circumstances, unless there is evidence from which a change in the condition could reasonably be inferred.
>
> "The jury could properly have found in this case that the sign was erected incorrectly by Baltimore County on 1 May 1970 and remained that way until it was corrected on 5 October 1970. It follows that the evidence was sufficient to permit the jury to find that Baltimore County was negligent and that its negligence was a proximate cause of the injury. It was error to direct a verdict for Baltimore County."

The crucial language in the statement of law above quoted begins with the words, "and the condition is one which by its nature is relatively permanent, rather than transitory or

---

accident. As the trial court stated after holding that the officer's testimony was inadmissible:

"This is particularly true when you consider the officer's testimony that when he first arrived on the scene the light was red when the locomotive had not yet reached the point where the officer observed the light turn red at the later observation."

changeable." The trial court, perhaps in contemplation of the rule so well stated in *Stitzel,* found that "the condition of the automatic signal system is of a transitory or changeable nature" and one likely to be affected by the enormous impact created by a collision between a 250,000 pound locomotive and tractor-trailer.[7] In our judgment, he was correct. The difference between a stationary traffic sign as in *Stitzel* and an electrically operated signal system as in this case is, we think, very obvious.[8]

Our conclusion that the trial court was correct in holding inadmissible Officer Pulaski's testimony concerning his observation of a signal malfunction some eight hours later is not, however, dispositive of this appeal. Appellant contends that there was *other* evidence sufficient to permit the jury to find that Canton was negligent.

In this respect appellant relies upon the following testimony:

 (a) Mr. Cragnelli, and his helper, Mr. Jackson, testified that the locomotive was approximately 30 feet from the Boulevard when their light changed from red to green. (As previously stated, the first circuit was at a point 220 feet west of the Boulevard and, if the system was functioning as designed, the locomotive would have been approximately 190 feet, rather than 30 feet, west of the southbound lane when the signal guiding the train turned green);

 (b) Officer Pulaski testified that in taking measurements at the scene immediately after the accident, he observed the battery well for circuit 1T but did not see any wire connected to the track. (This

---

7. Although no derailment occurred, the engineer's helper testified that the locomotive "raised up" at the time of the impact.

8. In Baltimore County v. Stitzel, 26 Md. App. 175, this Court held *inter alia* that upon remand of the proceedings in Stitzel v. Kurz, the trial judge correctly denied Baltimore County's motion for a directed verdict.

testimony contrasted with that of Walter H. Phipps who was employed by the railroad as a master mechanic and testified for the appellant as an adverse witness. Mr. Phipps stated that all wires were connected to the tracks when he inspected them later that day);

(c) the testimony of Mr. Phipps that on the day after the accident he attempted, unsuccessfully, to activate circuit 1T with a copper jump cable by stretching his arms across the tracks and applying the wires to them.

Appellant's specific contention in its brief on the basis of the above is this:

"The testimony of the crew, in conjunction with (1) the officer's testimony that the wire was not connected where the first circuit originated, and (2) the testimony of Canton's employee that he could not actuate the first circuit, supported a rational and permissible inference, if not direct proof, that the signal system was not functioning at the time of the accident, a condition not unfamiliar to Canton in view of its knowledge of prior malfunctions in the system (T. 122-25)."

First, we observe that the testimony of the crew may *not* be taken "in conjunction with" the officer's testimony that the wire was not connected for the precise reason that the testimony of the crew and that of the officer that the wire was not connected are in hopeless conflict. Obviously, the crew could not have seen a green light governing the train's passage, as well as the reflection of the red light controlling the vehicular traffic had the wire not been connected. Furthermore, the testimony of the crew may not be read "in conjunction with" the testimony of Canton's employee that he could not activate the first circuit with a jump cable several hours later. The testimony of the crew establishes that the first circuit *did* function, although not

immediately [9] and there is no testimony that the manual application of a jump cable is the equivalent of or comparable with the activating capability of a 250,000 pound locomotive.

Secondly, we repeat the truism that negligence must be proved and never will be presumed. In the words of Professor Prosser, *supra:*

> "What is required is evidence, which means some form of proof; and it must be evidence from which reasonable men may conclude that, upon the whole, it is more likely that the event was caused by negligence than that it was not. As long as the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that the burden of proof has not been sustained." p. 211.

Here, treating the evidence in the light most favorable to Robin, there is some evidence of a partial malfunction in the testimony of the two crew members. The record is barren, however, of evidence to show that this partial malfunction constituted a dangerous condition of which Canton had notice and which was the proximate cause of the accident.

With respect to the element of notice, Robin failed to establish that Canton had actual knowledge of or was reasonably chargeable with knowledge of any system malfunction prior to the accident. Such knowledge is an essential element of negligence. *Adams v. Carey*, 172 Md. 173, 186, 190 A. 815 (1937). As the Court of Appeals stated in *Texas Company v. Pecora*, 208 Md. 281, 118 A. 2d 377 (1955), "Unless a defendant has actual knowledge or is reasonably chargeable with knowledge that his act or omission may

---

**9.** Since the traffic and train signals took approximately five seconds to change from the time they were activated, and since the crew testified that the train was 30-40 feet from the road when the signals changed, the train would have been located entirely in circuit 1T when it activated the signals, indicating that circuit 1T did function the morning of the accident.

injure another, he is not guilty of negligence." This knowledge is the foundation for actionable negligence since, "[n]egligence presupposes a duty of taking care and this in turn presupposes knowledge or its equivalent." *Aleshire v. State, Use of Dearstone,* 225 Md. 355, 170 A. 2d 758 (1961). As stated in 57 Am.Jur.2d., *Negligence,* § 54: "[T]he authorities emphasize the point that knowledge, actual or imputed, is the wellspring of the duty to use care to avoid injury to another."

The only support we find in the record for appellant's claim of sufficient notice to Canton of a signal malfunction is the testimony of Mr. Phipps, when pressed by counsel for appellant, that it was "possible" that complaints were received from members of train crews concerning the operation of the signal on North Point Boulevard. The only other testimony elicited from Mr. Phipps on this subject was that there were occasional complaints from the police department — but the essence of these complaints in the words of Mr. Phipps was that "they would go red for the road" [10] without being activated by a train.

The fact that it was "possible" that Mr. Phipps heard — unparticularized, undated, unidentified as to subject matter — complaints from the train crews, is not sufficient reasonably to charge Canton with knowledge of any system malfunction. Ironically, the only other complaints — those made by the police — that the vehicular traffic signals turned red on some occasions when no train was crossing the road, were not evidence of a dangerous condition. They may, indeed, have constituted "notice" that the fail-safe system was functioning precisely as designed, to protect motorists when a battery ran down or the system otherwise lost its voltage.

With respect to the element of proximate cause, it is fundamental, of course, that on the issue of causation, as on all other issues essential to a claim of negligence, the plaintiff has the burden of proof by a preponderance of the

10. As previously indicated the system was so designed that the signals were green for vehicular traffic but would turn red when activated by a crossing train.

evidence. It is required that evidence be introduced "which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Prosser, supra*, p. 241. (Emphasis added.) As the author further states:

> "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant.* Where the conclusion is not one within the common knowledge of laymen, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn." p. 241. (Emphasis added.)

In the instant case, the uncontradicted testimony of the crew members, upon which appellant itself relies, relates to a partial malfunction in circuit 1T. This is not testimony that the train failed completely to activate circuit 1T but rather that it did so when it was 30 to 40 feet from the first southbound lane rather than approximately 190 feet. The only testimony in the record concerning the location of the tractor-trailer at the time the locomotive entered the intersection, is that of the engineer's helper that it was "several hundred feet away." Except for the absence of skidmarks, there is no evidence in the record concerning the speed of the tractor-trailer. No expert testimony was offered on behalf of Robin as to the reasonably probable effects which the time lag in the activation of circuit 1T would have had upon a vehicle "several hundred feet away" traveling in the inner northbound lane, or, indeed, any distance from the point of impact; and the subject is certainly not one "within the common knowledge of laymen." Furthermore, appellant's contentions with respect to the automatic light system take no account of the other warning devices which accompanied the movement of the locomotive: the powerful headlights mounted on the Diesel, its underlights, the automatic whistle and the continuous sound of the horn. *Cf.*

*Buczkowski v. Canton R.R. Co.*, 181 Md. 377, 30 A. 2d 257 (1943).

It is our conclusion that the evidence upon which appellant relies on the question of the railroad's primary negligence was legally insufficient and was properly disregarded by the trial court. As the Court of Appeals stated in *Flohr v. Coleman*, 245 Md. 254, 225 A. 2d 868 (1967):

> "A party who has the burden of proving another party guilty of negligence does not meet this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that the other party has been guilty of negligence."

*Judgments affirmed; appellant to pay the costs.*