Amy SHIELDS, Plaintiff,

v.

ELI LILLY AND COMPANY, Defendant.

Civ. A. No. 87–2166 (RCL).

United States District Court, District of Columbia.

Sept. 26, 1988.

Aaron M. Levine, Washington, D.C., for plaintiff.

Loretta M. Smith (argued), Marshall Simonds, Goodwin, Procter & Hoar, Boston, Mass., and James A. Hourihan, Gail L. Heriot, Hogan & Hartson, with her on the brief, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiff Amy Shields has brought a products liability action against the defendant. Specifically, she alleges that she was severely and permanently injured, including, but not limited to, clear cell adenocarcinoma of the vagina, as a result of her exposure *in utero* in 1955 to diethylstilbestrol (DES) manufactured, sold, distributed, and/or promoted by the defendant. The case is presently before the Court on defendant's Motion for Summary Judgment.

### I

In her response to defendant's interrogatories, plaintiff states that her mother was prescribed DES during the "[e]arly period of [her] pregnancy" with plaintiff by Dr. Alexander B. Sinclair. Dr. Sinclair has since died, and his medical records are no longer in existence. Plaintiff further responded that her mother filled the prescription at Watkins Drug Store, but that her mother has no other recollection of the physical description of the pill taken or instructions for its use.

Prior to plaintiff's submission of the answers to interrogatories, plaintiff's counsel deposed plaintiff's mother, Margaret Shields. Margaret Shields testified in her deposition that she was staining during the first trimester, and her obstetrician, Dr. Sinclair, put her on bed rest and gave her a prescription to prevent miscarriage. While she did not recall the name of the medication, she described it as similar to "little red cinnamon drops or pills," which were smaller than aspirin, and said that she took it twice daily for about one month. She further testified that her recollection was refreshed by a small, red pill that she had picked from a "lineup" of some twenty-five pills shown her by plaintiff's counsel. Plaintiff gives no explanation for the inconsistency between this deposition testimony and the subsequent response to defendant's interrogatories, other than to say that plaintiff did not confer with her mother in

completing the interrogatories, notwithstanding the express instructions to do so. Finally, Margaret Shields testified that her belief that the medicine she took was DES was based solely on the much later consensus of opinion of plaintiff's physicians, and that she had never made any effort to confirm that she had indeed taken DES.

Far from corroborating Margaret Shields' deposition testimony, her labor and delivery records, as well as subsequent medical records, tend to contradict it. First, her labor and delivery records for plaintiff's birth contain the cryptic notation, "spotting—3 days—June cleared bed rest." Second, when Margaret Shields gave her medical history to a different doctor during her second pregnancy, she apparently made no mention of any medication. Those records contain the notation, "3½ months—bleeding—4 days in bed."

Dr. Sinclair's nurse from the mid–1950's, Marjorie Clifford, was also deposed, after first submitting a sworn affidavit. However, contrary to plaintiff's argument, in her brief and during oral argument, neither the affidavit nor deposition shows that Dr. Sinclair had a "custom" or "habit" of prescribing DES to pregnant women who were bleeding and threatening to miscarry. In fact, just the opposite is true. First, in nurse Clifford's affidavit, she stated that she recalled Margaret Shields being a patient of Dr. Sinclair's. Further, she recalled that "on occasion," Dr. Sinclair would prescribe DES to women who were straining or threatening to miscarry in early pregnancy. Nurse Clifford's subsequent deposition is even more telling. When asked about "Dr. Sinclair's usual, ordinary management of the case," nurse Clifford responded, "The first thing he insisted upon was absolute bed rest. If they didn't respond to bed rest, he may have used, on occasion, some oral medications or injectable medications. It depends. Each situation was a little different."

Plaintiff next relies on two affidavits. In the first, Dr. Shane, a physician/pathologist, states that he has reviewed three slides taken from the vaginal tract of Amy Shields, and that in his opinion the tissue was abnormal. Further, he feels this abnormality "was caused by her in-utero exposure to synthetic estrogen (DES) or its congeners and that such pathologic findings would not appear in the absence of DES exposure to a statistical certainty of 97% to 99.7%." In the second affidavit, Linwood Tice, a professor at the Philadelphia College of Pharmacy and Science, states that he is "personally familiar with the physical appearances of the commonly-used pharmaceuticals employed by physicians in the 1950's," and that based on that familiarity, he feels "there was no progesterone or progesterone-type medication commonly and ordinarily on the market and dispensed which was red in color and smaller than an aspirin in size."

Finally, prior to any litigation, plaintiff was diagnosed as having DES changes in her cervix and vagina. Defendant vigorously contests the plaintiff's characterization of her injuries as being the "signature disease" of DES; and contends *in utero* exposure to other synthetic estrogens has similarly been associated with the same changes in the cervix and vagina, that the term DES in the medical literature is a shorthand term for all of the various synthetic estrogens, and that clear cell adenocarcinoma occurs in the absence of any exposure to DES or any other drug.

## II

Federal Rule of Civil Procedure 56(e) provides, *inter alia*, that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the party." Fed.R.Civ.P. 56(e). Furthermore, "[s]upporting and opposing affidavits shall be made on *personal knowledge* [and] shall set forth such facts as would be *admissible in evidence*." *Id.* (emphasis added).

The Advisory Committee notes that the "very mission of the summary judgment procedures is to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e), advisory committee note. This view is confirmed by the 1986 trilogy of Supreme Court cases dealing with the issue of summary judgment. *See generally, Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the most recent case of that trilogy, the Court of Appeals had reversed the District Court, holding that the defendant asbestos manufacturer's failure to negate plaintiff's allegation that her husband had been exposed to the defendant's product made summary judgment inappropriate. The Supreme Court reversed, holding that in absence of any admissible evidence by plaintiff to support a necessary element of her claim, the moving party had no burden to negate those claims. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. (Here "there can be 'no genuine issue as to any material fact,'" because there is a complete absence of any admissible evidence to support the plaintiff's claims.)

In the second case of the trilogy, the Supreme Court held that while it is not the task of the trial court to "weigh the evidence and determine the truth of the matter," *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511, neither should the court send a case to the jury "merely because some evidence has been introduced by the party having the burden of proof, unless the evidence is of such a character that it would warrant a jury in finding a verdict in favor of that party." *Id.* at 251, 106 S.Ct. at 2511. The Court went on to explain that "[i]f the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82 [87 S.Ct. 1425, 18 L.Ed.2d 577] (1967) *(per curiam),* or is not significantly probative, [*First Nat'l Bank v.*] *Cities Service* [391 U.S. [253] at 290, 88 S.Ct. 1575 at 1593, 20 L.Ed.2d 569] summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511. The test to be applied is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252, 106 S.Ct. at 2512; *accord, Tidler, et al. v. Eli Lilly & Co.,* 851 F.2d 418 (D.C. Cir.1988) (upholding district court's granting of summary judgment for defendant against nine of the plaintiffs, because those plaintiffs were unable to produce any non-speculative evidence that [the] defendant manufactured the tablets ingested by their mothers).

Finally, in *Matsushita Electric Industrial Co., Ltd.* the Supreme Court reversed the Court of Appeals, holding that the appellate court had applied the wrong standard in reasoning that based on the "inferences" it could draw from the record a reasonable fact finder could find the necessary elements of the claim. *Matsushita Electric,* 475 U.S. at 583–88, 106 S.Ct. at 1354–57. The Supreme Court specifically held that "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. [citations omitted] ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' *Cities Service, supra,* [391 U.S.] at 289 [88 S.Ct. at 1593]." 475 U.S. at 586–89, 106 S.Ct. at 1356–57. Additionally, "if the factual context renders respondents' claims implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be required." *Id.* at 587, 106 S.Ct. at 1356.

In sum, although "credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions ..., [such that] the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Adickes v. Kress,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), the ultimate test to be applied by the court is whether a "fair minded jury" could reasonably conclude that the plaintiff is entitled to a verdict.

*Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III

Applying the above principles to the facts at hand, it is evident that the plaintiff has failed to meet her burden of showing sufficient, non-speculative, admissible evidence to survive defendant's motion for summary judgment. As the Supreme Court held in *Celotex,* the entry of summary judgment is appropriate where despite having had "adequate time for discovery" the plaintiff still "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Plaintiff unquestionably bears the burden of proving that her mother ingested Eli Lilly's DES while pregnant with plaintiff. Even considering, as the court must, the evidence in the light most favorable to the plaintiff, there is simply not a nonspeculative connection between plaintiff's injuries and DES manufactured by the defendant. Plaintiff's pathologist, Dr. Shane, states that plaintiff's injuries were likely caused by DES *or its congeners.* Nurse Clifford states that Dr. Sinclair prescribed DES *on occasion,* but that on occasion he also prescribed other medications. Professor Tice adds only that there was no *commonly used* progesterone or progesterone-type medication which came in small, red pills. He says nothing about less commonly used progesterone, much less about DES and its congeners. That leaves only Amy Shields with clear cell carcinoma, which Dr. Shane opines was caused by either DES or its congeners, and Margaret Shields' deposition testimony that she took a tiny, red pill. Although a factfinder could reasonably infer, based on Professor Tice's affidavit, that the pill Margaret Shields recalls was not a commonly or ordinarily available progesterone or progesterone-type medication, there is no reasonable basis upon which to infer, as plaintiff avers, that the pill could be none other than DES. The pill could have been DES, but it may just as easily have been a DES congener, or anything else for that matter.

Taken together, plaintiff's evidence does not provide a basis for anything other than sheer speculation. It certainly does not provide a basis upon "which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Thus having carefully considered the defendant's motion for summary judgment, plaintiff's responses, oral argument for both sides, and the entire record of this case, and finding no genuine issue of material fact in dispute, it is therefore

ORDERED, that defendant's motion for summary judgment is granted and plaintiff's claims against defendant are dismissed with prejudice.