17 A.3d 718

Anthony K. SOLESKY, et al.

v.

Dorothy M. TRACEY.

No. 2207, Sept. Term, 2009.

Court of Special Appeals of Maryland.

April 5, 2011.

294

Kevin A. Dunne & Matthew T. Vocci (Ober, Kaler, Grimes & Shriver, on the brief), Baltimore, MD, for Appellant.

Clifford A. Robinson (H. Barritt Peterson, Jr. & Assoc., on the brief), Towson, MD, for Appellee.

Panel: MEREDITH, MATRICCIANI and RONALD B. RUBIN, (Specially assigned), JJ.

MEREDITH, J.

This appeal challenges the grant of a motion for judgment in favor of the defendant landlord in a case in which the parents of a young boy sought damages for injuries inflicted by an American Pit Bull Terrier ("pit bull") owned by the landlord's tenants. On April 28, 2007, a pit bull escaped from a pen that was located in the backyard of a residential property in Towson, Maryland. In an alley adjacent to the backyard of the property, the pit bull seriously injured ten-year-old Dominic Solesky. The property from which the dog escaped was owned by Dorothy M. Tracey, appellee, and rented to Thomas C. O'Halloran and Erin Cesky, the owners of the pit bull that attacked the child. On March 24, 2008, the child's parents—Anthony K. Solesky and Irene Solesky ("the Soleskys"), appellants—filed a complaint against the dog's owners and the landlord, seeking money damages in the

Circuit Court for Baltimore County. The claims against the dog's owners were discharged in bankruptcy.

The claims against the landlord included counts alleging negligence and strict liability. During discovery, the Soleskys moved for sanctions against the landlord for not attending a deposition due to poor health, and for spoliation of evidence. The circuit court denied both of these motions, and the case proceeded to a jury trial. At the close of the Soleskys' case, the landlord moved for judgment, and the circuit court granted judgment in her favor, ruling there was insufficient evidence that the landlord (a) was on notice of the vicious nature of the dog, or (b) retained control over the tenants' use of the leased premises. The Soleskys appealed, and contend that the circuit court erred (1) in denying them sanctions, and (2) in granting the motion for judgment in favor of Tracey.[1]

In our view, the evidence, when considered in a light most favorable to the Soleskys, was sufficient to survive a motion for judgment. Accordingly, we will vacate the circuit court's

---

1. In their brief, the Soleskys presented the following questions:
 I. Did the lower Court err when it refused to sanction a party/defendant who refused to appear for a duly noted deposition and never sought a Protective Order when the knowledge of the defendant is essential to proving the elements of the tort claim against her?
 II. Did the lower Court err in refusing to sanction defendant for spoliation of evidence where defendant landlord had taken photographs of the leased premises on the day of reletting the premises to the tenant owner of two pit bulls and later refused to produce those photographs in discovery?
 III. Where a landlord relets its residential house in a suburban neighborhood to a tenant with two pit bulls, does the landlord owe a duty to the neighborhood residents where the landlord's property has no fence and a makeshift pen without a top for the containment of the pit bulls?
 IV. Did the Court of Appeals, in *Matthews* [*v. Amberwood*, 351 Md. 544, 719 A.2d 119 (1998)], impose a duty upon landlords who rent to tenants with pit bulls in a residential neighborhood to act with reasonable care in requiring appropriate housing or storage of the two pit bulls when outside the house?
 V. Do landlords owe a higher duty of care when renting a residential home to a tenant with two pit bulls?

entry of judgment in favor of the landlord, and remand the case to that court for further proceedings.

## Standard of Review

■ Because this appeal arises from the circuit court's granting of a motion for judgment at the close of the plaintiffs' case in a jury trial, our task is to determine "whether, as a matter of law, the evidence produced during [the Soleskys'] case, viewed in a light most favorable to [them], is legally sufficient to permit a trier of fact to find that the elements" of a cause of action have been proved by a preponderance of the evidence. *Driggs Corp. v. Md. Aviation,* 348 Md. 389, 402, 704 A.2d 433 (1998); Md. Rule 2–519(b). As Chief Judge Krauser observed for this Court in *Moore v. Myers,* 161 Md.App. 349, 363, 868 A.2d 954 (2005):

> "Maryland has adopted a very restrictive rule about granting [motions for judgment] in negligence actions." *Banks v. Iron Hustler Corp.,* 59 Md.App. 408, 423, 475 A.2d 1243 (1984). Indeed, it "has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury." *Id.* (quoting *Fowler v. Smith,* 240 Md. 240, 246, 213 A.2d 549 (1965)). "The rule has been stated as requiring submission if there be any evidence, however slight, legally sufficient as tending to prove negligence, and the weight and value of such evidence will be left to the jury." *Id.* (emphasis omitted).

*Accord Plitt v. Greenberg,* 242 Md. 359, 367–68, 219 A.2d 237 (1966) ("[T]his Court has always maintained that if there be any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court has invaded the province of the jury by declaring a directed verdict.").

■ A jury's verdict may rest upon circumstantial evidence alone. *See Robinson v. State,* 348 Md. 104, 112, 702 A.2d 741 (1997) ("Circumstantial evidence is in no manner intrinsically inferior to direct evidence. . . . In a given case, circumstantial evidence may be more persuasive than direct evidence.").

We set forth the following facts, and discussion, in accordance with this standard.

### Facts and Procedural History

On December 26, 2005, Tracey entered into an agreement to lease the residential property she owned at 208 Burke Avenue (also known as "208 East Burke Avenue") to O'Halloran and Cesky for one year. Tracey had used the services of a Long & Foster real estate agent to find tenants for the property. The lease agreement included a provision stating:

> The following pet(s) may be kept on the premises: *Ameri-can Bulldog Terrier.* Tenant agrees to arrange for and pay the costs of having the carpets/flooring professionally cleaned, deodorized and treated for fleas, ticks and other vermin at the termination of occupancy, should the above consent be given. Paid receipts for such cleaning and treatment must be provided to Landlord. Tenant further agrees to assume all liability and to be responsible for any damage caused by said pet(s) such as, but not limited to damage to carpets, sub flooring and wood floors, screens, glass and frames and landscaping. Tenant must comply with any pet ordinances enacted by the local authorities, homeowners or condominium associations. Tenant shall not keep the pet on the premises if the pet is or becomes vicious or threatening, bites or attacks any person or other pet, or otherwise is or becomes a nuisance. Tenant assumes full liability for the results of any actions of pet.
>
> With the exception of properties located in Montgomery County, if Tenant permits or harbors a pet on the premises without: 1) permission of Landlord, and 2) payment of the required pet deposit, tenant shall be in violation of the lease. If tenant violates the "no pets" provision of the lease, tenant agrees to pay, as additional rent, $200 per month per animal for each month violation exists, in addition to any damages, physical or otherwise, which in the opinion of Landlord were caused by the unauthorized animal on the premises. Landlord also reserves the right to require removal of the animal

from the premises, and require additional security deposit to be held for balance of the tenancy.

The dwelling known as 208 Burke Avenue comprises the western half of a duplex structure, the other half of which is not owned by Tracey. The main entrance to the property faces south, along Burke Avenue. The backyard of the property contains an unfenced grass plot, and a parking pad. A paved alley abuts the backyard.

On December 31, 2006, the initial lease term for 208 Burke Avenue expired. Tracey's daughter, Rose M. Schisler, drafted a new lease agreement, dated January 22, 2007, to re-let the property to O'Halloran and Cesky. On January 23, 2007, Tracey and Schisler visited 208 Burke Avenue in order to inspect the property and review the proposed new lease with O'Halloran and Cesky. They parked in the alley behind the property. Schisler saw that O'Halloran and Cesky kept two pit bulls on the property, one male and one female. Schisler observed in the backyard what she described as a "very tall, kind of cube-shaped" pen. A photograph of the pen shows that it is approximately five feet long, five feet wide, and four feet high. It is made of chain-link fencing, and has an open top. Aside from the pen, the backyard of Tracey's property is unenclosed.

On the day of the inspection, Tracey, O'Halloran, and Cesky signed the lease agreement Schisler had drafted. Schisler signed the agreement as a witness, and was identified in Paragraph 15 of the lease as the "Property Manager." With respect to the dogs, the renewal lease included the following paragraphs:

11. Pets: The Lessee is allowed to keep pets that are agreed upon by Lessee and Lessor: 2 pit bull dogs.

13. The Lessee will be civically [sic] and financially responsible for their pets. Should their pet(s) harm anyone, it is the Lessee's financial responsibility to pay for the damage. The Lessor is in NO Way responsible.[2]

---

2. The paragraph numbers in the lease agreement skipped directly from paragraph 11 to 13, without including a paragraph 12.

The renewal lease did not contain the additional pet language which was in the Long & Foster lease agreement for the initial lease.

Approximately three months later, on April 28, 2007, ten-year-old Dominic Solesky was playing with three of his friends in the alley which runs behind Tracey's property. On the opposite side of the alley are the backyards of houses fronting on Ridge Avenue. Dominic lived at 249 Ridge Avenue with his parents (the Soleskys) and his brother. Dominic and his friends were playing a game in which they would hide, then shoot at one another with foam darts from toy guns. While Dominic was hiding, he heard his friend Scotty scream. Dominic ran to the alley, where he saw Scotty's toy "gun [lying] in the middle of the alley with a little bit of blood next to it." Scotty had been bitten by the tenants' male pit bull, which had escaped from the pen. By the time Dominic reached the alley, O'Halloran had placed the dog back in its pen.

Dominic walked toward the toy gun Scotty had dropped in the alley. As he did so, he heard the sound of a fence rattling. He turned around to see the pit bull that had bitten Scotty "kicking off" the female pit bull—*i.e.*, standing on the female dog's back—in an attempt to climb over the side of the pen and escape. Dominic started running away as the male pit bull escaped the pen. The pit bull overtook Dominic, jumped on his back, and pulled him to the ground. The pit bull bit Dominic's face, arm, and leg, and "started dragging [him] around the alley." O'Halloran eventually pulled the dog off Dominic. By that time, Dominic was in the alley behind 225 Ridge Avenue, and the occupant of that residence called 911 for help. As a result of the attack, Dominic suffered injuries to his face, left arm, nose, and chest, and a torn femoral artery in his left leg, which required extensive surgery and physical therapy. He spent 17 days in Johns Hopkins Hospital.

The Soleskys filed a complaint in circuit court, asserting claims against Tracey sounding in negligence and strict liabili-

ty.[3] During discovery, the Soleskys noted the deposition of Tracey for March 19, 2009. On March 9, 2009, Tracey's counsel informed the Soleskys via letter that Tracey was unable to attend the deposition, and offered that Schisler be deposed in her place. At the time, Tracey was 89 years old. Tracey's counsel provided the Soleskys with two letters from Tracey's primary care physician stating that Tracey had "cardiac problems and can not tolerate undue stress," and that the "stress of deposition questioning and court proceedings may exacerbate her medical conditions and may be detrimental to her health." Counsel for the Soleskys agreed to depose Schisler, and indicated that the Soleskys would renew their request to depose Tracey if Schisler's answers were deemed insufficient. Tracey's counsel did not move for a protective order to prevent Tracey from being deposed.

After taking Schisler's deposition, the Soleskys moved to compel Tracey's attendance at a deposition, or, in the alternative, moved the court to sanction Tracey by entering a default judgment for her failure to attend the deposition scheduled for March 19, 2009. The court denied the Soleskys' motion, stating:

> Considering the medical evidence and advice that the 89 year old Ms. Tracey is unable to appear at a deposition, the granting of this motion would be improvident. Perhaps the movant will utilize the Maryland Rules to find another avenue to obtain information from and about Ms. Tracey.

Because Tracey produced almost no documents, the Soleskys also moved for sanctions for Tracey's alleged spoliation of documents. Counsel for Tracey opposed the motion and explained that, if there ever were any further documents, they had been lost. At an unspecified point in time, Tracey had stopped living on her own, and had moved into her daughter's home. Schisler testified in her deposition that the movers had lost many of her mother's things during the move, including

---

3. The Soleskys also pled assault, battery, strict liability, and negligence claims against O'Halloran and Cesky, who are not parties to this appeal because their debts were discharged in bankruptcy.

her leasing files. In addition, Schisler testified that she herself had taken photographs of 208 Burke Avenue, but that the digital camera on which these photographs were taken was broken, and she had thrown it away. Schisler's deposition included the following exchange:

Q. [Soleskys' Counsel] Does your mother maintain a file of leases on properties that she's ever owned?

A. [Schisler] She did, but again, as I said earlier in the deposition, most of her files were lost in the move.

Q. How were the files maintained when she lived in her former home?

A. I don't know.

Q. Did she have a file cabinet of any sort?

A. She did have a file cabinet. . . .

\* \* \*

Q. . . . Did you take photographs of the pen that Mr. O'Halloran had built in the back of the property?

A. I don't know if I did or not.

Q. What's the status of accessing those photographs today, Miss Schisler?

A. Nil to none.

Q. Why?

A. Because I don't know where they are.

Q. You said your digital camera was broken. Your camera might be broken, but what might be stored in the memory card might well still be there.

A. But once the camera was broken, I threw it away.

The Soleskys moved for the court to enter an order of default against Tracey, or, in the alternative, instruct the jury that it should infer that the destroyed evidence was unfavorable to her defense. The circuit court denied the Soleskys' motion, stating:

What the movant attempts to do is to equate the absence of records held by the landlord, and absence of correspondence, etc. with a failure to preserve which the movant sees

as equating to an intent to destroy evidence. This is not a permissible inference under the circumstances recited concerning the activities of the 89 year old not[-]all[-]that[-]well Landlord....

This is a terrifying and tragic case where a child was severely injured by a pit-bull. However, there is simply no evidence that the Landlord kept prior leases which were thrown away or pictures or anything else which were discarded in connection with this law case or the incident of the attack. [Spoliation of] evidence has to have a nexus [and that] is not evident from the information presented by the movant in support of the motion.

The case proceeded to a three day jury trial. In addition to presenting evidence, as outlined above, regarding the renewal of the dog owners' lease, the Soleskys elicited testimony from neighbors who described the aggressive nature of the dogs.

Lisa Luntz was a neighbor who lived at 206 Burke Avenue during the years 2000 to 2009. She testified about her experiences with the dog which she described as the male pit bull that attacked Dominic:

Q. [Soleskys' counsel] And when you were living there— when you were living there, did you see the dogs in the pen at your neighbor's home [208 Burke Avenue]?

A. [Luntz] Yes.

Q. And how often did you see the dogs in the pen?

A. When they were living at that home, I'd say almost daily unless maybe they were—maybe it was a lot of rain or something. Maybe we wouldn't on that day, but pretty often.

Q. And how did you feel about the dogs?

[Tracey's counsel] Objection.

THE COURT: Rephrase that, please.

Q. [Soleskys' counsel] How would the dogs act when they were in the pen?

A. In terms of when both the male and female came along because originally there was just the female, so when the

male and female were together, originally when the male was a puppy, there was definitely barking, but I certainly didn't feel threatened or they didn't appear too aggressive. **However, as soon as the male dog was getting older and bigger, that's when we noticed frequent barking and jumping you know—**remember, this time our daughter is about a year and a half, and we were definitely concerned at that point because **anybody that walked out of our home or to our home from the back would experience that aggression from the dogs, particularly the male dog, so unnerving to say the least.**

Q. Did you change your behavior because of the dogs?

A. Absolutely.

Q. What'd you do?

A. We had to start going out our front door, using that as our entrance and exit.

THE COURT: Pardon me. You got to go slower. I didn't hear your answer.

A. I'm sorry. We had to use our front door as our main entrance and exit.

Q. [Soleskys' counsel] And did you ever see a top or a covering put on the pen?

A. No.

Q. Do you know, I guess, roughly when you noticed the male dog being aggressive in the timeline of things?

[Tracey's counsel] I would object to the conclusion.

THE COURT: Overruled. You can answer that.

A. I can only imagine the dog was a few months old, and he was certainly bigger than a puppy.

(Emphasis added.)

Michelle Bowers lived at 225 Ridge Avenue at the time the pit bull mauled Dominic. She came to Dominic's aid, and dialed 9–1–1 after the attack. She testified about witnessing the pit bull's aggressive behavior prior to the day of the attack:

Q. [Soleskys' Counsel] And how did you know who—how did you know where the pit bull was kept that attacked Dominic?

A. [Bowers] Because I walk my dog in the alley, and **I had walked past multiple times, and the dog has actually tried to jump the fence before and get to us,** but the owner of the dog came to the window, did whatever command he did to tell the dog to get down. The dog got down, **but needless to say, I stopped walking my dog in the alley.**

Q. Your dog, Daisy?

A. My dog is Daisy, yes.

Q. And how often before Dominic was attacked had you walked past the pit bulls?

A. I mean, what do you mean? I assume before.

Q. How many times?

A. Oh, well, it **only took that once with the dog outside for me to not walk the dog back there anymore.**

Q. What did the dog do when you and Daisy walked past him?

A. **A lot of growling, barking, and ultimately the dog had stood on the back of the female and was teeter tottering on top with his belly on top of the top of the fence. So all it would have taken is one extra little push, and that dog would have been over.**

(Emphasis added.)

At the conclusion of the Soleskys' case, Tracey moved for judgment pursuant to Maryland Rule 2–519. In granting Tracey's motion, the circuit court described the evidence presented to it as follows:

> So here I am having heard a couple days of testimony, a number of witnesses. The Plaintiff is asking that this Court continue this case on the theory of negligence on the part of Miss Tracey and admittance [sic] indicating she's primarily negligent for failing to maintain the property in a safe condition and strict liability.

So before I get to that, I want to make sure that the parties and the record is clear as to what I see as the evidence at this point in time. Irene Solesky, the very lovely mother, loving mother of Dominic, her testimony was very compelling as to what happened to her son, and I felt pain for her. I'm a father of four kids.

It is noteworthy that she didn't even know of the existence of the dogs and never saw the pen. So vis-a-vis liability, her testimony wasn't helpful at all to his Court. Lisa Luntz, next door neighbor basically, someone moved in in 2007—I think she was [i]n error, probably was of '06—but that's neither here nor there, eventually [the tenant] had a male pit bull of [sic] puppies.

She saw the dogs in the pen almost daily. Certainly the male was barking. Sometimes the female was barking. They were jumping in the pen. **Anyone who walked by would experience their aggressiveness. That's her language,** that's what they said, **and she was concerned.**

**She noted no top to the pen, no cover, and she noted that the male after growing past puppyhood became more and more aggressive** in her words. She never saw the dog get out of the pen, never saw the dog bite anybody. That's the testimony from Miss Luntz.

Michelle Bowers, formerly Mayer, lives off some next door—I think the other side of 208—she watched the owner of the dog on a terrible day involved dragging away. She's the one who called the police, made the 911 call. **She saw the dog one time, maybe twice jumping up and down and was fearful as a result of that** and stopped walking her dog past this pen.

(Emphasis added.)

The court explained its basis for granting judgment in favor of Tracey as follows:

**No provision of the lease gave the landlord control over any portion of the rental premises.** Thus the appellees had no duty to inspect the premises, no duty to inspect the premises. That's significant to this Court. Then [the

case law goes] into the question of knowledge, and this is something that has bothered the Court because I acknowledge how hamstrung [the Soleskys' counsel] must have felt and his clients that Mrs. Tracey never testified, couldn't testify.

[The court] did not compel her to testify for health reasons and whatever, 89 years old. And I'm sympathetic to [the Soleskys' counsel's] argument that he couldn't get to her knowledge because he couldn't get to depose her, but there's lots of ways, as counsel knows, to show knowledge on the part of somebody even without the language of the person. Language can be imputed to people.

**So what I was looking for is what knowledge could be imputed inferentially to Mrs. Tracey.**

\* \* \*

**Mrs. Tracey knew that there were two pit bulls, knew that there were two pit bulls. This Court cannot take that knowledge and stretch it out into knowledge that they were vicious.** The cases are clear that the knowledge that somebody's keeping a pit bull acknowledged in the lease seen by her and her daughter does not ipso facto turn it into the knowledge of a vicious animal.

Everybody goes to the act that the animal does like everybody and works backwards and says look how vicious the animal is. This Court can't do that. I have to look at what the facts and circumstances were in front of Miss Tracey and look prospectively.

I can't look at the conduct of the animal at the time he regrettably attacked Dominic and infer or assume that she knew he was vicious by the fact that there was a pen and by the fact that there [were] two dogs. I can't do it. I won't do it. And therefore, **I do not feel that there is any evidence from which the jury could find as a fact that these animals were vicious or that Mrs. Tracey had a duty by virtue of some control over the leased premises.**

(Emphasis added.)

This timely appeal followed.

## Discussion

### I. Denial of Motions for Sanctions

■ The Soleskys argue that the circuit court erred in not sanctioning Tracey for failing to appear at a deposition, and for her alleged spoliation of evidence. According to the Soleskys, the court's action deprived them of evidence that may have helped establish Tracey's knowledge of the danger posed by the pit bull.

The Soleskys sought to depose Tracey on March 19, 2009. Prior to the scheduled date, Tracey's counsel informed the Soleskys that Tracey would be unable to appear. Tracey's physician provided two letters explaining that Tracey had "cardiac problems and can not tolerate undue stress." Counsel for the Soleskys agreed to depose Tracey's daughter—who had drafted the lease agreement, had accompanied her mother during the January 2007 inspection of the premises, and had witnessed the signing of the pertinent lease agreement—in her mother's stead. But the Soleskys "reserve[d] the right to later depose Mrs. Tracey if questions cannot or will not be answered [by the daughter]."

The Soleskys subsequently moved to compel Tracey's attendance at a deposition, and, in the alternative, asked that the court enter a default judgment against her. In denying the Soleskys' requests, the court found that Tracey's advanced age and uncontroverted medical problems were sufficient to excuse her from testifying at the deposition, and, subsequently, at trial.

■ The circuit court has "great discretion" in deciding whether to impose discovery sanctions under Md. Rule 2–433. *See Rodriguez v. Clarke*, 400 Md. 39, 56–57, 926 A.2d 736 (2007). We perceive no abuse of discretion in the court's decision to neither compel Tracey's attendance nor sanction her, where her non-attendance was due to health issues explained to the Soleskys in advance of the scheduled deposition date.

■ In addition, the Soleskys moved for sanctions for alleged spoliation of documents, including photographs, relating to Tracey's leasing of 208 Burke Avenue. In their motion, the Soleskys argued that Tracey had failed to provide such documents as "the lease file for the Subject Property, any records of payments, tenant or neighbor complaints and correspondence between" Tracey and her tenants, and between Tracey and her real estate agent. The Soleskys further alleged that Tracey's daughter had destroyed the photographs which she had taken during the January 2007 inspection of the property.

■ The circuit court has the discretion to sanction a party for spoliation of evidence. *Klupt v. Krongard*, 126 Md.App. 179, 197–98, 728 A.2d 727 (1999). In *Klupt*, this Court stated the test to be applied by the circuit court in determining whether the spoliation of evidence warrants a sanction. The threshold inquiry, *id.* at 199, 728 A.2d 727, is whether there was "[a]n act of destruction" of discoverable evidence on the part of the accused party. By necessity, this inquiry begins after the movant shows that the evidence actually existed in the first place. Here, however, the circuit court noted that there was no evidence that *relevant* documents or pictures existed. Because the court was not clearly erroneous in finding that the Soleskys' motion did not support a conclusion that unproduced documents having material relevance to this case had ever been in existence, the circuit court did not abuse its discretion in refusing to sanction Tracey for allegedly destroying evidence. *Cf. Cost v. State*, 417 Md. 360, 369–71, 10 A.3d 184 (2010) (noting that the destruction of evidence may give rise to a permissible inference that the evidence would have been unfavorable to the destroying party, and that a jury instruction on the issue may be appropriate).

## II. The Landlord's Duty

■ A prima facie case of negligence, in general, requires proof of the following elements: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached the duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximate-

ly resulted from the defendant's breach of the duty.'" *Shields v. Wagman*, 350 Md. 666, 672, 714 A.2d 881 (1998) (quoting *BG & E v. Flippo*, 348 Md. 680, 700, 705 A.2d 1144 (1998)). At issue in this appeal is whether the first element is met— whether a jury could rationally conclude that Tracey had a duty to take reasonable actions to protect persons from the tenants' pit bulls which Tracey expressly authorized the tenants to maintain on the property.

The Maryland cases that have held landlords liable for injuries caused by an occupant's dog have imposed a duty upon the landlord based upon two conditions: (1) the landlord's awareness of the presence of a dog that has exhibited viciousness; and (2) some opportunity for the landlord to exert control over the presence of the dog. *Matthews v. Amberwood*, 351 Md. 544, 570, 719 A.2d 119 (1998) ("where a landlord retained control over the matter of animals in the tenant's apartment [by virtue of a 'no pets' clause in the lease], coupled with the knowledge of past vicious behavior by the animal, the extremely dangerous nature of pit bull dogs, and the foreseeability of harm to persons and property in the apartment complex, the jury was justified in finding that the landlord had a duty to the plaintiffs and that the duty was breached"); *Shields, supra*, 350 Md. at 690, 714 A.2d 881 ("a landlord of commercial property may be held liable for injuries sustained in the common area and caused by a pit bull kept on the leased premises by one of the tenants where the landlord has knowledge of the potential danger in the common area and the ability to rid the premises of that danger by refusing to re-let the premises"). *See generally* Danny R. Veilleux, *Landlord's Liability to Third Person for Injury Resulting from Attack on Leased Premises by Dangerous or Vicious Animal Kept by Tenant*, 87 A.L.R.4th 1004, 1012 (1991) ("The general rule regarding the liability of a landlord to a third person for an attack by a tenant's animal on the leased premises appears to be that the landlord is not liable unless the landlord had knowledge of the animal's presence and its dangerous tendencies, and had control of the premises or otherwise had the

ability to eliminate the danger by having the animal removed or confined. . . . ").

In *Shields, supra*, 350 Md. at 670, 714 A.2d 881, a tenant who rented space within a strip mall kept a pit bull named "Trouble" on the leased premises. After the tenant's lease agreement expired, the landlord permitted the tenant to occupy the premises on a month-to-month basis. Another tenant informed the strip mall's manager of Trouble's "viciousness and the possible threat [which] Trouble's presence posed." *Id.* at 670, 714 A.2d 881. Trouble subsequently escaped from the tenant's leased space, and bit one of the strip mall's customers on the leg. While that customer's suit against the strip mall's owner was being litigated in circuit court, Trouble bit another person, who also sued the owner of the strip mall, alleging negligence and strict liability. Both attacks by the pit bull occurred in the parking lot of the strip mall. On motions for judgment, the circuit court granted a judgment in favor of the landlord as to each of the two victims' claims. In a consolidated appeal, the Court of Appeals reversed the circuit court's judgments, noting that the injuries occurred in a "common area," and the owner "had knowledge of the potential danger" as well as "the ability to rid the premises of that danger by refusing to re-let the premises." *Id.* at 668–69, 714 A.2d 881.

In *Shields,* the "critical factor" of control was present because the landlord could have refused to re-let to the tenant unless the tenant took reasonable steps to ensure that Trouble did not present a danger to others. The Court of Appeals explained, *id.* at 682, 714 A.2d 881: "As each month went by, the premises were in effect re-let to [the tenant]. Thus, each time, the [landlord] had the opportunity to refuse to re-let the premises, thereby abating the danger posed by Trouble's presence."

In addition, there was legally sufficient evidence of the landlord's knowledge of the danger in *Shields* because: (1) "[t]here was ample indication that [the landlord] was aware of Trouble's presence at the strip mall"; (2) "[t]here was also

evidence that Trouble was vicious"; and (3) "[t]here was evidence that [the landlord] knew that Trouble was vicious" because the landlord "made frequent visits to the premises," and, "given the testimony of the other witnesses . . . that they had often seen Trouble act viciously, a jury could conclude that [the landlord] also had the opportunity to observe Trouble's viciousness." *Id.* at 687–89, 714 A.2d 881.

Soon after *Shields* was decided, the Court of Appeals had another occasion to consider a landlord's liability for injuries inflicted by an occupant's pit bull in *Matthews v. Amberwood,* 351 Md. 544, 719 A.2d 119. In *Matthews,* a tenant allowed her boyfriend's pit bull, named "Rampage," to stay in her apartment, despite a clause in her lease agreement which stated that she was "[n]ot to have any pets on the premises." *Id.* at 549, 719 A.2d 119. Several of the landlord's employees reported to the landlord's manager "dangerous encounters involving the dog," which they described as "vicious." Rampage subsequently mauled a sixteen-month-old child to death while inside the tenant's apartment. The child's parents filed suit, asserting various legal theories, including negligence on the part of the landlord. A jury returned a verdict in favor of the parents on the negligence claim, and the trial court denied the landlord's motion for judgment notwithstanding the verdict. *Id.* at 552, 719 A.2d 119.

In affirming the circuit court's judgment in favor of the child's parents against the landlord, the Court of Appeals stated, *id.* at 557, 719 A.2d 119: "[T]he principle that the landlord may have a duty with regard to matters within his control extends beyond common areas; it may be applicable to conditions in the leased premises." The Court ruled that the landlord retained control over the dangerous condition (*i.e.,* the presence of Rampage) "by virtue of the 'no pets' clause in the lease." *Id.* at 558, 719 A.2d 119. The Court stated that the landlord could have exerted control over the presence of the pit bull by enforcing the "no pets" clause: "The lease plainly stated that breach of the 'no pets' clause was a 'default of the lease.' Such a default would enable that landlord to bring a breach of lease action to terminate the tenancy." *Id.*

The landlord was on notice that the tenant was keeping Rampage in the apartment in violation of the no pets clause, and further knew of "dangerous incidents" involving Rampage. Despite having knowledge of this dangerous condition on the leased premises, the landlord took no action to abate the danger, either by suing the tenant or threatening to sue if the tenant did not "get rid of the aggressive animal." *Id.*

The Court observed that the possibility of someone being attacked by Rampage "was entirely foreseeable." *Id.* at 561, 719 A.2d 119. In support of its conclusion that an attack by Rampage was foreseeable, the Court noted that the "extreme dangerousness of this breed ... is well recognized." *Id.* The Court explained, *id.* at 561–63, 719 A.2d 119:

> Thus, the foreseeability of harm in the present case was clear. The extreme dangerousness of this breed, as it has evolved today, is well recognized. "Pit bulls as a breed are known to be extremely aggressive and have been bred as attack animals." *Giaculli v. Bright,* 584 So.2d 187, 189 (Fla.App.1991). Indeed, it has been judicially noted that pit bull dogs "bite to kill without signal" (*Starkey v. Township of Chester,* 628 F.Supp. 196, 197 (E.D.Pa.1986)), are selectively bred to have very powerful jaws, high insensitivity to pain, extreme aggressiveness, a natural tendency to refuse to terminate an attack, and a greater propensity to bite humans than other breeds. The "Pit Bull's massive canine jaws can crush a victim with up to two thousand pounds (2,000) of pressure per square inch—three times that of a German Shepard or Doberman Pinscher." *State v. Peters,* 534 So.2d 760, 764 (Fla.App.1988), *review denied,* 542 So.2d 1334 (Fla.1989). *See also Hearn v. City of Overland Park,* 244 Kan. 638, 650, 647, 772 P.2d 758, 768, 765, *cert. denied[,]* 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989) ("pit bull dogs represent a unique public health hazard ... [possessing] both the capacity for extraordinarily savage behavior ... [a] capacity for uniquely vicious attacks ... coupled with an unpredictable nature"[;] and ... "of the 32 known human deaths in the United States due to dog attacks ... [in the period between July 1983 and April 1989], 23 were

caused by attacks by pit bull dogs"). Pit bull dogs have even been considered weapons. *See State v. Livingston*, 420 N.W.2d 223, 230 (Minn.Ct.App.1988) (for the purpose of first degree assault); *People v. Garraway*, 187 A.D.2d 761, 589 N.Y.S.2d 942 (1992) (upholding conviction of pit bull's owner of criminal possession of a weapon in the third degree).

(Footnotes omitted.) [4]

In *Moore, supra*, 161 Md.App. at 369, 868 A.2d 954, we cited *Matthews* for the proposition that "[p]it bulls, like cars, are

---

**4.** The Court further noted in *Matthews, id.* at 561 n. 4, 719 A.2d 119, that, because of the "unique danger pit bulls pose," "[a] number of states [and] municipalities . . . have enacted legislation that classify pit bull dogs as vicious," and numerous courts had

upheld these enactments, noting that the inherent viciousness of pit bulls provide[s] a rational basis for such legislation. *See American Dog Owners Association, Inc. v. Dade County*, 728 F.Supp. 1533, 1538 (S.D.Fla.1989); *Starkey v. Township of Chester*, 628 F.Supp. 196, 197 (E.D.Pa.1986); *Holt v. City of Maumelle*, 307 Ark. 115, 119, 817 S.W.2d 208, 210–211 (1991); *Colorado Dog Fanciers, Inc. v. City and County of Denver*, 820 P.2d 644, 652 (Colo.1991); *State v. Peters*, 534 So.2d 760, 764 (Fla.App.1988); *review denied*, 542 So.2d 1334 (Fla. 1989); *American Dog Owners Assoc., Inc. v. City of Des Moines*, 469 N.W.2d 416 (Iowa 1991); *Hearn v. City of Overland Park*, 244 Kan. 638, 648–650, 772 P.2d 758, 766–768, *cert. denied*, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989); *Garcia v. Village of Tijeras*, 108 N.M. 116, 119–121, 767 P.2d 355, 358–360 (N.M.Ct.App.), *cert. denied*, 107 N.M. 785, 765 P.2d 758 (1988) ("evidence establishing that the American Pit Bull Terrier breed possesses inherent characteristics of aggression, strength, viciousness and unpredictability not found in any other breeds of dog[,] . . . more dog-bite incidents are caused by American Pit Bull Terriers than by other breeds[,] . . . [e]xtraordinary measures are required for confining American Pit Bull Terriers, such as a six-foot chainlink fence with an overhanging ledge to keep the dogs from jumping out," and that the Albuquerque Humane Society reported that no other breed of dog has "ever caused the kinds of injuries or exhibited the aggressive behavior shown by American Pit Bull Terriers . . . [and the humane society does not] adopt out pit bull dogs because of their potential for attacks on other animals and people"); *State v. Anderson*, 57 Ohio St.3d 168, 169, 174, 566 N.E.2d 1224, 1225, 1229, *cert. denied*, 501 U.S. 1257, 111 S.Ct. 2904, 115 L.Ed.2d 1067 (1991) (harboring a "dog commonly known as a pit bull dog" is prima facie evidence of ownership of a vicious dog); *City of Richardson v. Responsible Dog Owners of Texas*, 794 S.W.2d 17 (Tex.1990); *Greenwood v. North Salt Lake City*, 817 P.2d 816, 821 (Utah 1991) (pit bull dogs "are known for a unique combination of

'potentially dangerous.' 'The extreme dangerousness of this breed . . . is well recognized,' the Court of Appeals noted in *Matthews v. Amberwood Associates, Ltd.,* 351 Md. [at 561, 719 A.2d 119]."

Notwithstanding the *Matthews* Court's judicial notice of the "extreme dangerousness of this breed" known as pit bulls, *id.* at 561, 719 A.2d 119, this Court, in *Ward v. Hartley,* 168 Md.App. 209, 220 n. 7, 895 A.2d 1111, *cert. denied,* 394 Md. 310, 905 A.2d 844 (2006), rejected the notion that a victim of a dog attack could establish a *prima facie* showing of dangerous propensity by simply proving that the attacking dog was a pit bull. In contrast to *Shields* and *Matthews,* we affirmed a summary judgment in favor of a landlord in *Ward,* where "[n]o provision of the lease gave the landlord control over any portion of the rental premises." 168 Md.App. at 217, 895 A.2d 1111.

In *Ward,* a tenant's pit bull bit a cab driver on the premises of the tenant's rental home. The cab driver filed suit against the landlord, alleging negligence and strict liability. The circuit court granted the landlord's motion for summary judgment, and this Court affirmed. In addition to the lack of evidence that the landlord retained control over the maintenance of pets on the premises, there was also no evidence whatsoever that the landlord knew that this particular dog was aggressive. *Id.* at 219, 895 A.2d 1111. Notwithstanding the absence of any evidence of express knowledge on the part of the landlord, the plaintiff in the *Ward* case asked this Court to adopt a rule providing that mere proof that the biting dog is a "pit bull"—even in the absence of any other evidence of a history of aggressive behavior on the part of the dog—satisfies

---

strength, agility, tolerance for pain, . . . aggressiveness[,] . . . were historically bred for fighting and killing, . . . have experienced a proportionately higher number of bites and attacks[,] . . . [and] . . . Animal Control treats pit bull dogs differently than other breeds"); *American Dog Owners Assoc. v. City of Yakima,* 113 Wash.2d 213, 217, 777 P.2d 1046, 1048 (1989); *Dog Federation of Wisconsin, Inc. v. City of South Milwaukee,* 178 Wis.2d 353, 367, 504 N.W.2d 375, 381 (Wis.Ct.App.), *review denied,* 508 N.W.2d 423 (Wis.1993).

the plaintiff's evidentiary burden of producing *prima facie* evidence of a dangerous condition. Writing for this Court, Judge Salmon explained, *id.* at 220 n. 7, 895 A.2d 1111, that the plaintiff must do more than simply show that the attacking dog was a pit bull:

> The [plaintiff] invites us "to establish an evidentiary rule that harboring a 'dog commonly known as a pit bull' is *prima facie* evidence of ownership of a vicious dog." We decline that invitation. First, it would be improper to do so because the appellees had no duty to inspect and discover Sammy's presence. Moreover, it is far from clear from this record that Sammy was "a pit bull dog." His owners described him as part pit bull and part chow. But, even if we were to assume, *arguendo,* that Sammy was pure pit bull, it is very doubtful, as a factual matter, that all pit bulls (dogs) are dangerous. Under such circumstances, it would be highly improper to impose, by judicial fiat, a principle that everyone should know that "fact."

■ This Court's opinion in *Ward,* therefore, established that, despite the widespread knowledge of the tendency of many pit bulls to be vicious—*see Matthews,* 351 Md. at 561, 719 A.2d 119, discussed above—in order to hold a landlord liable for injuries inflicted by a tenant's dog, it is not enough to prove that the tenant was permitted to keep a pit bull on or about the leased premises. Rather, there must be some evidence (1) of the dangerous propensities of the particular dog at issue, (2) that the landlord had notice that the tenant's dog posed a potential danger to humans, and (3) that the landlord had some right of control over the tenant's maintenance of the dog. This is true whether the attacking dog is a pit bull or a Shih Tzu.

The Soleskys contend that, in contrast to the *Ward* case, their evidence did more than simply prove that the offending dog was a pit bull. They assert that Tracey, as the owner of property where a dangerous pit bull was housed, owed Dominic a duty because she and her daughter, who acted as her agent at the time of lease renewal: (a) had actual knowledge

that her tenant was keeping two pit bulls in a small pen in the backyard of the premises; (b) personally inspected the property when the pit bulls were present and most likely observed the aggressiveness of the dogs, assuming the truth of the neighbors' testimony that anybody who came near the dogs "would experience that aggression from the dogs, particularly the male dog, so unnerving to say the least"; (c) given the "dangerous propensities of the breed," as noted in *Matthews,* should have foreseen that the presence of the pit bulls at that location posed a danger to passersby and children playing in the alley adjacent to the premises; (d) could have exercised control to abate the danger at the time of lease renewal; (e) rather than exerting control to abate the danger, expressly authorized the tenants to keep the pit bulls on the premises in an inadequate containment pen; and (f) in recognition of the danger presented by the tenants' aggressive dogs, added a clause to the renewal lease indemnifying the landlord against liability arising from injuries inflicted by the dogs. Tracey, on the other hand, contends that she owed no duty because (a) there was no evidence that she had prior knowledge that the particular pit bull that injured Dominic was prone to violence; and (b) in any event, she did not have the authority to remove the pit bull from the premises to prevent the attack.

### A. Knowledge

As noted above, in order for a landlord to have any duty relative to a dangerous animal on the premises, there must be some evidence that the landlord knew of the dangerous condition created by the presence of the animal. Here, Tracey's knowledge of the presence of the pit bulls is established by the fact that both of the lease agreements she entered into with O'Halloran and Cesky specifically allowed pit bulls to be kept on the premises. Moreover, the Soleskys elicited testimony that Tracey and her daughter inspected the premises on January 23, 2007, and the landlord saw the two pit bulls that were kept on the property. Tracey and her daughter also saw that there was a modest containment pen in

the backyard. Tracey's daughter described what she saw during the inspection:

Q. [Soleskys' Counsel] Had you ever seen the chain link pen that Mr. O'Halloran had built in the backyard?

A. [Schisler] Yeah. I think it was there the day we did this [*i.e.*, the inspection].

Q. So that when you signed [the January 23, 2007, lease agreement], you clearly knew that he had two dogs because you wrote that in the document, correct?

A. Right.

Q. And you knew they were pit bulls because you typed that in here, correct?

A. Correct.

Q. The exterior lot that was owned by your mother on Burke Avenue, it was not fenced in, was it?

A. No.

Q. Describe for me what you saw on the chain link type fencing that Mr. O'Halloran had created in the backyard on Burke Avenue?

A. It was a very tall, kind of cube-shaped fence.

Q. Was it the type of fencing that would allow a dog to run?

A. Not a whole lot, no . . . .

Q. Okay. How did you know that there were two pit bulls in the property when you prepared the contract, Exhibit 2 to the deposition?

A. I don't know how I kn[e]w that. I just kn[e]w that. I guess my mother must have told me.

 Although Tracey does not dispute having knowledge that her tenants maintained two pit bulls on the property, she asserts that there was no evidence from which the jury could have found that she knew these particular pit bulls posed a potential threat of harming anyone. Tracey is correct that there is no direct evidence in the record that she or her daughter personally observed the aggressive tendencies of these particular pit bulls. But, as the Maryland appellate

courts have explained many times, circumstantial evidence may satisfy a party's burden of production. *See, e.g., Todd v. Weikle,* 36 Md.App. 663, 670, 376 A.2d 104 (1977) ("A familiar Maryland rule is that a defendant's negligence may be shown by either direct or circumstantial evidence and may be inferred from all of the facts of the case."). And several of the Maryland cases imposing liability for dog attacks have relied upon circumstantial evidence of knowledge of the dog's potential for inflicting injury.

In *Shields,* 350 Md. at 684–85, 714 A.2d 881, the landlord "strenuously argued" that there was no evidence that he had prior knowledge of the vicious tendencies of the tenant's pit bull (Trouble). The Court of Appeals could not point to any direct evidence of the landlord's notice of vicious behavior by the pit bull prior to its first attack, but nevertheless held: "Although there was no evidence that Trouble had bitten anyone prior to [customer Shields], there was sufficient evidence upon which a jury could find that [the landlord] knew or should have known of Trouble's presence and viciousness and that Trouble posed a threat to those in the common area prior to the Shields attack." *Id.* at 687, 714 A.2d 881. The Court noted that a jury could have rationally found that the landlord had knowledge of the viciousness of the pit bull based upon the circumstantial evidence that (a) the landlord often visited the premises, (b) the pit bull was present on the premises, (c) the landlord had talked to the tenant about the pit bull and had told the tenant not to keep the dog there; and (d) *other witnesses* testified about the pit bull's frequent exhibitions of aggressive behavior. *Id.* at 687–89, 714 A.2d 881. The Court held that, "**given the testimony of other witnesses that Trouble was always present and that they had often seen Trouble act viciously, a jury could conclude that [the landlord] also had the opportunity to observe Trouble's viciousness.**" *Id.* at 688–89, 714 A.2d 881. (Emphasis added.) The same is true of the evidence in the record in the present case regarding the landlord's knowledge. *See also Matthews,* 351 Md. at 568, 719 A.2d 119, wherein the Court of Appeals quoted favorably from cases from other jurisdictions

which have determined that knowledge of the dangerous condition can be imputed to the landlord.

■ Furthermore, "Maryland does not subscribe to the one bite rule," *Shields, supra,* 350 Md. at 686, 714 A.2d 881, and a plaintiff is not required to prove that the particular pit bull had actually bitten someone prior to the subject attack in order to recover. *Id.* In support of this point, the *Shields* court cited two cases describing the duty of an owner of a vicious animal:

> *Bachman v. Clark,* 128 Md. 245, 248, 97 A. 440, 441 (1916) ("It must first be shown, **in order to render the owner liable for damages to one bitten by his dog,** that the dog had a vicious propensity, and second that such vicious propensity or inclination was known to its owner. But **the owner's knowledge of the dog's vicious propensity need only be such as to put him on his guard,** and to require him as an ordinary prudent person to anticipate the act or conduct of the dog resulting in the injury for which the owner is sought to be held liable."); *Twigg v. Ryland,* 62 Md. 380, 385–86 (1884) **(requiring only that the owner or keeper of a vicious animal have "knowledge of [a vicious animal's] disposition to commit such injuries" and not that the owner "has seen the animal attack mankind");**
> . . .

(Emphasis added.)

Several Maryland cases involving dog attacks have pointed to circumstantial evidence of knowledge of a dog's vicious propensity as sufficient evidence to take the case to the jury. In *Herbert v. Ziegler,* 216 Md. 212, 214, 139 A.2d 699 (1958), a Dalmatian dog caused a horse to throw its rider when the dog "came running at [the horse's] legs, growling and barking." Recognizing that, "[t]o hold liable the owner of a domestic animal that has caused injury, the claimant must show that the owner knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm," *id.* at 216, 139 A.2d 699, the Court of Appeals consid-

ered whether there was sufficient evidence of such knowledge. The sole evidence of knowledge identified by the Court was a comment made by a young stable boy immediately after the incident when he was asked what had happened. The stable boy "replied: 'Poppy [the dog] scared Chubby [the horse] again." Writing for the Court, Judge Hall Hammond wrote, *id.* at 217, 139 A.2d 699:

> From [the stable boy's] remark that "Poppy scared Chubby again", the jury could have found that whenever [the dog] ran at [the horse] as he did on the day of the accident, the otherwise gentle horse became frightened and shied or bolted. The use of the word "again" clearly permitted the inference that one or more similar occurrences had happened before. . . . The statement showed the knowledge of [the stable boy] as to the propensities of Chubby and his knowledge was the knowledge of [the dog's owner], his master, since [the stable boy] acquired it from his handling of Chubby, a part of the duties assigned to him by his master.
>
> This Court has said that if a plaintiff produces any testimony and any inference of fact fairly deducible therefrom of sufficient probative force to enable an ordinary, intelligent mind to draw a rational conclusion therefrom in support of his right to recover, the case must go to the jury. We think that an ordinary, intelligent mind could rationally find from the evidence that [the stable boy] was [the dog and horse owner's] agent and acted in the course of his employment in renting the horse, Chubby, to [the rider who was thrown]; that [the stable boy] had knowledge of the propensity of Chubby to be frightened by Poppy; that the accident occurred as a result of the repetition of this propensity; and that the knowledge of [the stable boy who was the owner's] agent, of the propensities of Chubby was legally imputable to [the owner]. Therefore, we find no error in the action of the trial court in submitting the case to the jury and in permitting the verdict to stand.

A single post-incident comment was also the focus of this Court's review of the sufficiency of the evidence of a dog

owner's knowledge of the dog's propensity for aggressive behavior in *Mazur v. Scavone,* 37 Md.App. 695, 378 A.2d 1355 (1977). After a German shepherd dog bit the face of a ten-year-old neighbor girl who was invited inside because she was selling Girl Scout cookies, an adult daughter of the dog's owners drove the child and the child's mother to the hospital. In the ensuing litigation, the dog's owners moved for summary judgment, arguing that there was insufficient evidence to show that they "knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that caused the harm." *Id.* at 697, 378 A.2d 1355. In opposition to the motion for summary judgment, the plaintiffs filed their sworn answer to an interrogatory in which they stated, *id.* at 698, 378 A.2d 1355:

> "The Defendant's daughter stated in the Plaintiff's car on the way to the hospital that the dog got excited and nervous around strangers and that they would have to get rid of the dog now because he had previously jumped others."

In addition, the plaintiffs filed an affidavit of the child's mother, in which the mother swore, *id.* at 700, 378 A.2d 1355: "After we were in the car a few minutes, Deborah [the dog owners' daughter] said that they would have to get rid of the dog now because he had previously jumped someone else."

The dog owners' daughter denied she had made any such statement, and stated in her affidavit, *id.* at 699, 378 A.2d 1355:

> "At no time on that date, or at any other time, did I say that my parents' dog got excited around strangers or that he had previously jumped on anyone. The fact is that the dog was gentle and had never attacked, bothered or threatened anyone prior to [the incident]."

The circuit court ruled that the mother's testimony about the comments made regarding the dog during the ride to the hospital were inadmissible hearsay, and the court granted summary judgment in favor of the dog's owners. We reversed, ruling that, because of the above statements attributed

to the dog owners' daughter, there was a genuine factual dispute as to the issue of whether the dog's owners had the requisite knowledge of the dog's vicious propensity.

We also held that circumstantial evidence of a dog owner's knowledge of the dog's vicious tendencies was sufficient to preclude summary judgment in *Moura v. Randall*, 119 Md. App. 632, 705 A.2d 334 (1998). In that case, the owner of a Rottweiler (named "Diesel") was taking the dog for a walk in the common areas of a townhouse community when the dog, which was not on a leash, "suddenly bolted after another dog." *Id.* at 636, 705 A.2d 334. When the owner eventually found the dog, it had "savagely attacked" a four-year-old boy at a distant apartment complex. *Id.* at 635, 705 A.2d 334. In response to the law suit filed by the child's parents, the dog's owner moved for summary judgment, arguing that there was no evidence that he "knew or should have known of Diesel's tendency to bolt or vicious propensities." *Id.* at 637, 705 A.2d 334. In his affidavit in support of the motion for summary judgment, the dog's owner "averred that Diesel was always friendly and, prior to the attack, Diesel had never been aggressive, Diesel had never bitten anyone, and Diesel had never run after another dog." *Id.* at 637, 705 A.2d 334. The circuit court granted the dog owner's motion for summary judgment, explaining:

> I have nothing to contradict the affidavit statements of the owner that he never experienced this particular animal to exhibit vicious propensities; that he had only had the dog bolt once, and that was when the dog was only a month or two or so into obedience training. It was some lengthy period before this tragic incident. . . .
>
> So, there is not any real evidence here that would show . . . a dispute that should be presented to the jury with regard to the owner's subjective knowledge of any propensities for this particular animal.

We reversed. Writing for this Court, Judge Ellen L. Hollander summarized the evidence in the record that created a genuine factual dispute as to whether the owner knew or

should have known of the dog's vicious propensity, *id.* at 637–38, 705 A.2d 334:

> [In opposition to the dog owner's motion for summary judgment, the plaintiffs] attached a copy of [the dog owner's] testimony, given under oath before the Animal Matters Hearing Board of Montgomery County (the "Board"). There, [the dog owner] conceded that, on one occasion when Diesel was unleashed, he had chased a cat into the wooded area behind [the dog owner's] residence. [The plaintiffs] posited that this incident charged [the dog owner] with the knowledge that Diesel might not always obey commands and that Diesel might run away if unleashed. [The plaintiffs] also submitted a copy of the testimony of Mark Lipsitt, a dog trainer and kennel owner with twenty-five years of experience working with animals, who appeared before the Board on December 5, 1994. Lipsitt's testimony concerned a report he prepared with respect to his examination of Diesel soon after the attack. He testified that when he examined Diesel, "the dog was straining at the leash. The dog was jumping up and down in an effort to get to me. He was barking. He was growling. He was snarling. He was baring his teeth, and he was snapping." Consequently, Lipsitt concluded that Diesel had "previous experience with agitation."

We held that the above evidence was "sufficient" to "create an inference as to appellee's knowledge of Diesel's dangerous behavioral propensities and thereby to establish an issue of material fact" that precluded the entry of summary judgment. *Id.* at 652, 705 A.2d 334.

In the present case, in ruling on the motion for judgment at the close of the plaintiffs' case, the trial court was required, as are we, to consider all evidence, and all inferences therefrom, in a light most favorable to the non-moving party. When so considered, there was sufficient circumstantial evidence before the jury from which it could have rationally concluded that Tracey was on notice of the potential danger posed by her tenants' pit bulls, including the particular male pit bull which attacked Dominic.

At the outset, we note that the evidence showed the landlord had sufficient concern that these particular dogs posed a threat to others that the landlord changed the language in the renewal lease by omitting the prohibition against keeping a "vicious or threatening" pet, and emphasizing that the landlord was "in NO WAY responsible" for damages inflicted by the dogs. The landlord's concern about liability for the pit bulls was consistent with the observations expressed by the Court of Appeals in *Matthews*, 351 Md. at 561, 719 A.2d 119, relative to the "extreme dangerousness of this breed." *See also Moore, supra*, 161 Md.App. at 369, 868 A.2d 954. Even though we ruled in *Ward* that a plaintiff does not establish a *prima facie* case of knowledge of danger by simply proving that the attacking dog was a pit bull, we have never held that a dog's breed could not be considered by the fact finder along with other evidence.

In addition to the evidence that the landlord expressed concern about liability for the tenants' dogs in the renewal lease provision, there was uncontroverted evidence that the landlord had visited the property and had seen these particular pit bulls first hand. In light of a neighbor's testimony that "anybody" who walked near these dogs would experience aggression from the dogs, the jury could have rationally inferred that the landlord, too, observed vicious behavior when she and her daughter visited the premises. *See Shields*, 350 Md. at 688–89, 714 A.2d 881. Neighbor Lisa Luntz testified that she had seen the tenants' pit bulls often, and she was concerned about the aggressive nature of the male dog particularly "because anybody that walked out of our home or to our home from the back would experience that aggression from the dogs, particularly the male dog, so unnerving to say the least." She was sufficiently alarmed that she avoided going near the dogs. Another neighbor, Michelle Bowers, testified to similar concern about the aggressive nature of the dogs. She testified that "the dog has actually tried to jump the fence before and get to us." She also testified about witnessing the male dog stand on the female dog's back and nearly escape the pen. She said there had been "[a] lot of growling,

barking, and ultimately the dog had stood on the back of the female and was teeter tottering on top with his belly on top of the top of the fence. So all it would have taken is one extra little push, and that dog would have been over." [5]

Considered in a light most favorable to the plaintiffs, the evidence was sufficient to meet the requirement set forth in *Shields* and *Matthews* that the landlord either knew or should have known of the dangerous condition posed by the tenants' male dog. Luntz testified that she was afraid to walk near the pit bull because of the aggression it exhibited toward anybody who walked near the back yard. Bowers witnessed the pit bull attempting to escape the pen and nearly succeeding. No issue was raised by the landlord, either at trial or on appeal, about the time frame when the neighbors made their observations, but the inference most favorable to the Soleskys is that the neighbors' observations were made prior to the date of the lease renewal. Tracey knew that her tenants were keeping the pit bull in a small pen in the backyard of the leased premises, and the testimony of the neighbors supports an inference that, when the landlord visited the property just three months before the attack, the landlord—like anybody else who approached the backyard—more likely than not

---

**5.** In one of the cases cited by the Court of Appeals in *Matthews, supra,* 351 Md. at 562, 719 A.2d 119, as an example of cases that had upheld legislation banning pit bulls, the New Mexico Court of Appeals summarized evidence that had been presented about the difficulty of confining pit bulls, *Garcia v. Village of Tijeras,* 108 N.M. 116, 120, 767 P.2d 355, 359 (N.M.Ct.App.1988), stating:

> Other evidence tended to establish that the American Pit Bull Terrier is an exceptionally strong and athletic dog. Extraordinary measures are required for confining American Pit Bull Terriers, such as a six-foot chainlink fence with an overhanging ledge to keep the dogs from jumping out, and six-inch wide, one-foot deep concrete footings around the base to keep the dogs from digging under. They have exceptionally strong bites, possibly twice the strength of bites of other dogs. They can grip cyclone fencing and tear it from its mounting, and have been known to destroy sheet metal panels by ripping them apart with their teeth.

We note, however, that the Soleskys did not introduce evidence during the trial of this case like that described above in the opinion of the New Mexico Court of Appeals.

would have seen the male pit bull behave in the way Luntz and Bowers described. The evidence, if believed, supported the syllogism: (a) the dog exhibited aggression toward anybody who walked near the back of the property; (b) the landlord parked in back of the property on the day of lease renewal; (c) the dog would have exhibited aggression toward the landlord on the day of lease renewal. The emphatic exculpatory language Tracey's daughter added to the lease renewal agreement is further support for the inference that the landlord foresaw the risk that one of these pit bulls would harm some person.

This evidence of the landlord's knowledge, when considered in a light most favorable to the Soleskys, was sufficient to survive the motion for judgment. The jury was not obligated to find—as the trial judge apparently assumed—that, on the occasion the landlord and her daughter inspected the premises, the dogs were uncharacteristically on good behavior. The testimony of the neighbors, if believed, would support a rational inference that the landlord witnessed the same aggressive behavior which Lisa Luntz said "anybody that walked out of our home or to our home from the back would experience." As the Court of Appeals ruled in *Shields, supra,* 350 Md. at 688–89, 714 A.2d 881, the testimony of these witnesses was sufficient to support an inference that the landlord was aware of the vicious tendencies regularly observed by others.

### B. Control

 In the present case, considering all evidence and all inferences therefrom in a light most favorable to the Soleskys, a reasoning jury could have also rationally concluded that the control factor was met. A landlord may exercise control over the premises by refusing to extend the tenancy or by imposing conditions at the time of lease renewal. In *Shields,* 350 Md. at 670, 714 A.2d 881, for example, the lease had expired and the dog owner remained on the premises as a month-to-month tenant to whom the landlord could refuse to re-let the premises upon the expiration of each month. The Court of Appeals observed that the landlord's opportunities to refuse to renew

the tenant's lease satisfied the requirement that the landlord have control over the presence of the dangerous dog, stating, *id.* at 682, 714 A.2d 881:

> [The landlord] here could have exercised control over [the pit bull] Trouble by refusing to re-let the premises to [the tenant] unless [the tenant] agreed not to bring Trouble there. [The tenant] had originally leased the premises pursuant to a written lease; however, that lease had expired prior to the attacks that led to the instant case, and [the tenant] remained as a month-to-month tenant. As each month went by, the premises were in effect re-let to [the tenant]. Thus, each time, the [landlord] had the opportunity to refuse to re-let the premises, thereby abating the danger posed by Trouble's presence.

The Soleskys argue that Tracey had a similar opportunity to control the danger posed by the tenants' pit bulls in the present case. They note that, as in *Shields,* before entering into the new lease agreement with the dogs' owners—approximately three months before the male pit bull injured Dominic—Tracey could have exerted control to abate the dangerous conditions, either by refusing to re-let or by imposing restrictions regarding the dogs. But, at the point of lease renewal, Tracey failed to require the tenants to take any safety measures, and merely insisted that the tenants include a provision in the lease (a) agreeing to pay for damages the dogs might inflict, and (b) acknowledging that "[t]he Lessor is in NO Way responsible."

The Soleskys contend that, instead of simply trying to disclaim responsibility in the event the dogs attacked anyone, the landlord should have either refused to re-let the premises, or refused to allow the dogs to remain, or required O'Halloran and Cesky to implement reasonable containment measures to ensure that their pit bulls would not escape the pen or the premises. We agree with the Soleskys that, considering all of the evidence in a light most favorable to the Soleskys, a reasoning jury could have rationally found that, prior to execution of the lease on January 23, 2007, Tracey had the ability to exert control over the dangerous condition on the

premises by either requiring O'Halloran and Cesky to take measures to ensure the pit bulls would be adequately confined to the premises, or by refusing to re-let the premises to O'Halloran and Cesky if they were unwilling to abate the danger.

 Finally, we observe that, under the rules stated in RESTATEMENT (SECOND) OF TORTS § 379A (1965), and RESTATEMENT (SECOND) OF PROPERTY (LANDLORD AND TENANT) § 18.4 (1977), the duty to protect persons from dangerous animals maintained on one's property can extend to passersby who are foreseeably injured by an unrestrained animal. The first of these, § 379A of the RESTATEMENT (SECOND) OF TORTS, provides:

Activities After Lessor Transfers Possession

A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if,

(a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and

(b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

An example provided in Comment c, Illustration 1, states:

1. A leases land to B for use as a baseball park. At the time of the lease A knows that there is an unreasonable risk that in the ordinary course of a baseball game balls will be hit into the public highway in a manner dangerous to those using it. After B enters into possession, and in the course of a baseball game, a ball is hit into the highway, crashes into the windshield of an automobile, and injures C, the driver. A is subject to liability to C.

Pertinent to this case, Comment d provides:

d. The liability stated in this Section cannot be avoided by a clause in the lease exonerating the lessor from all responsibility or liability. Third persons outside of the land,

who are not a party to such an agreement, are not affected by it.

The RESTATEMENT (SECOND) OF PROPERTY similarly provides in § 18.4:

Activities After Landlord Transfers Possession.

A landlord is subject to liability for physical harm to persons outside the leased property caused by activities of the tenant or others on the leased property after the landlord transfers possession only if:

(1) the landlord at the time of the lease consented to the activity or knew that it would be carried on; and

(2) the landlord knew or had reason to know that it would unavoidably involve an unreasonable risk, or that special precautions necessary to safety would not be taken.

An example provided in Comment b, Illustration 2, states:

2. L leases property to T for use as a stone quarry. In the course of operating the quarry, T's blasting operations cause physical harm to a person outside the leased property. If L knows or has reason to know that any such blasting will involve an unreasonable risk of physical harm to those outside the leased property, L is subject to liability to the injured person.

These principles are consistent with Maryland cases that have imposed liability upon dog owners for attacks that occurred off the owners' premises when it was foreseeable that the dog would leave the property where the dog was normally maintained. *E.g., Bachman, supra,* 128 Md. at 246, 97 A. 440 (while playing in street near dog's home, ten-year-old boy attacked); *Buck v. Brady,* 110 Md. 568, 571, 73 A. 277 (1909) (dog that was allowed to run free even though suspected of being rabid bit person a quarter mile away from the owner's home); *Moura, supra,* 119 Md.App. 632, 636, 705 A.2d 334 (Rottweiler bolted away from owner and then attacked a child at a nearby apartment complex); *Hammond v. Robins,* 60 Md.App. 430, 437, 483 A.2d 379 (1984) (dog foreseeably ran into street and caused bicycle riders to fall and sustain injuries).

■ Accordingly, even if Dominic was outside the boundaries of the leased premises at the time the pit bull escaped and mauled him, the landlord could have liability if the jury finds that conditions existed as set forth in the above-quoted sections of the Restatements.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED.**

**CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

RUBIN, J., dissenting.

I respectfully dissent from part II of the panel majority's opinion. To be sure, the incident of April 28, 2007, was horrific. In my judgment, however, the circuit court correctly concluded that the evidence presented at trial by the plaintiffs was legally insufficient to sustain a verdict against the landlord. As a consequence, the circuit court properly granted the landlord's motion for judgment under Maryland Rule 2–519 at the close of the plaintiffs' case. *See Veytsman v. New York Palace, Inc.*, 170 Md.App. 104, 112, 906 A.2d 1028 (2006).

The majority begins its opinion by stating that Maryland is very forgiving in allowing even slight circumstantial evidence of negligence to go to the jury. This is true as far as it goes, but not all evidence is *legally sufficient* evidence of negligence. *See Fowler v. Smith*, 240 Md. 240, 246–47, 213 A.2d 549 (1965). This case, I am confident, would be decided quite differently if the dogs in question were of another breed. And no case should be decided, as the majority's opinion surely implies, simply by saying that "in a close case" the jury must decide. As we held in *Robin Express Transfer, Inc. v. Canton R.R. Co.*, 26 Md.App. 321, 328, 338 A.2d 335 (1975), such an approach "betrays a fundamental misconception of the respective functions of court and jury where the sufficiency of circumstantial evidence is involved." We continued:

It is the function of the court, in the first instance, to decide whether the inference of negligence is legitimate or permis-

sible. If the decision is "no" the evidence should be with-held from the jury. Contrariwise, if the decision is "yes," the evidence should be submitted to the jury for its evalua-tion of the force of the inference of negligence.

26 Md.App. at 328, 338 A.2d 335.

This important role of the court as a gatekeeper in tort cases is recognized by the leading treatise on the subject.

But over such questions of fact the courts always have reserved a preliminary power of decision, as to whether the issue shall be submitted to the jury at all. If the evidence is such that no reasonably intelligent person would accept it, it becomes the duty of the court to remove the issue from the jury, and to nonsuit the plaintiff, or to direct a verdict for the defendant, or to set aside a verdict once rendered.

W. Keeton, *Prosser and Keeton on Torts* § 37 at 236 (5th ed. 1984)(footnote omitted).

Nor is it sufficient to suggest that a verdict may rest entirely on circumstantial evidence. *See Robinson v. State,* 348 Md. 104, 112, 702 A.2d 741 (1997). Although it may, the court still must determine whether the legitimate inferences that can be drawn from circumstantial evidence are legally sufficient to support a plaintiff's verdict. *C & P. Tel. Co. of Maryland v. Hicks,* 25 Md.App. 503, 524, 337 A.2d 744 (1975). "Inferences must be based on reasonable probability, rather than speculation, surmise, or conjecture." *Ward v. Hartley,* 168 Md.App. 209, 218, 895 A.2d 1111 (2006). In my view, the evidence presented by the plaintiffs at the trial of this case was insufficient as a matter of law and would, under the views expressed in the majority's opinion, permit a verdict to stand based on the fact that the dogs in question were of the pit bull terrier breed.

The majority concedes that the plaintiffs failed to present any direct evidence at trial of any prior misconduct by these particular dogs. For example, there was no evidence of prior biting, attacking, running loose or escaping from confinement. Nor was there any direct evidence that the landlord—or anyone else for that matter—was aware of any actual vicious

propensities or bad acts of these particular animals. The majority, nevertheless, holds that the following circumstantial evidence was legally sufficient for the jury to find for the plaintiffs: (1) the lease contained a provision allowing the tenant to keep two pit bull terriers on the demised premises; (2) the landlord knew that the tenant kept two of these dogs in a pen in the backyard; (3) language in the lease required the tenant to pay for any damage or harm caused by the dogs; and (4) two neighbors testified that the dogs jumped and barked when other persons or animals passed by their pen and that they avoided the area in which the dogs were kept. I disagree that this was legally sufficient circumstantial evidence to allow a rational jury to return a verdict for the plaintiffs. *See Veytsman v. New York Palace, Inc.,* 170 Md. App. at 118–19, 906 A.2d 1028 (plaintiff's evidence of prior similar incidents legally insufficient to hold restaurant owner liable in tort for assault committed on the premises).

In Maryland, the keeper of a domestic animal may be held liable in tort under theories of negligence, strict liability or both. *Pahanish v. W. Trails, Inc.,* 69 Md.App. 342, 356, 517 A.2d 1122 (1986); *Slack v. Villari,* 59 Md.App. 462, 470, 476 A.2d 227, *cert. denied,* 301 Md. 177, 482 A.2d 502 (1984). But a landlord may be held liable to a third-party for the actions of a tenant who keeps a dog only if the landlord knew, or under the circumstances should have known, of the dangerous or vicious propensities *of the particular dog. Matthews v. Amberwood,* 351 Md. 544, 570, 719 A.2d 119 (1998). The majority's opinion eviscerates this long-settled requirement. *Twigg v. Ryland,* 62 Md. 380, 385–86 (1884). As Judge Salmon reiterated for this Court in *Ward v. Hartley,* 168 Md.App. at 220 & n. 7, 895 A.2d 1111, the fact that the dog in question is a pit bull does not place the landlord on notice that a particular dog is or likely will be vicious. *See Moura v. Randall,* 119 Md.App. 632, 653, 705 A.2d 334 (1998) ("To be sure, the fact that Diesel was a Rottweiler is not sufficient to establish that he is vicious."); *Slack v. Villari,* 59 Md.App. at 476, 476 A.2d 227 ("[T]he mere fact that the dog that injures a plaintiff belongs to a breed with an unsavory reputation, absent evi-

dence that the particular dog was of a violent nature, is insufficient to prove scienter.") *See also Herbert v. Ziegler,* 216 Md. 212, 216–17, 139 A.2d 699 (1958) (discussing legal sufficiency of the evidence of the owner's knowledge that a particular dog in question "was mischievous").

Although the majority rightly acknowledges these legal points, it nonetheless proceeds to say that the jury can, without the aid of expert testimony, consider the breed of the dog. This is completely unwarranted. The majority then goes on to recite what it views as legally sufficient circumstantial evidence of the landlord's knowledge of actual or potential dangerousness of these particular dogs. I disagree. None of the items of evidence pointed to by the majority, singly or even in combination, are legally sufficient to submit this case to a jury.

The fact that the dogs were kept in an enclosure is not evidence or notice of any vicious propensities of these particular animals. *McDonald v. Burgess,* 254 Md. 452, 458, 255 A.2d 299 (1969). Moreover, the fact that the dogs in this case barked or jumped when persons or other dogs walked by or near their enclosure likewise is not evidence of viciousness or notice of potential danger to third parties. *Hiner v. Mojica,* 271 Mich.App. 604, 722 N.W.2d 914, 919–20 (2006) (collecting cases). Barking and jumping is what dogs of every breed, including pit bulls, do. *See Plowman v. Pratt,* 268 Neb. 466, 684 N.W.2d 28 (2004) ("Normal canine behavior, such as a dog barking at a stranger, is not sufficient to infer that a landlord has actual knowledge of a dog's dangerous propensities.") *See also Batra v. Clark,* 110 S.W.3d 126, 130 (Tex.App.2003) (rendering judgment for the defendant when there was no evidence that the landlord "knew that it was a potentially vicious animal or identified the dog's bark as the bark of a potentially vicious animal.")

Further, the fact that two neighbors were subjectively afraid of pit bull terriers likewise is not sufficient to impute knowledge of potential dangerousness to the landlord. It is not "reasonable to attribute vicious propensities to a dog

merely because he barks at strangers, *because a person is afraid of a dog,* or because a city ordinance requires a dog to be restrained at all times." *Royer v. Pryor,* 427 N.E.2d 1112, 1117 (Ind.App.1981) (emphasis added). The facts of this case, even taken in the light most favorable to the plaintiffs, are not even remotely similar to those held to be sufficient by the Court of Appeals to impute knowledge. *See Shields v. Wagman,* 350 Md. 666, 687–90, 714 A.2d 881 (1998) (holding that landlord's knowledge could be imputed where another tenant informed the landlord's agent of the dog's viciousness prior to the attack). In this case, there was no evidence presented to show that the landlord or her daughter knew that the dogs could escape from the pen. Specifically, the evidence did not show that the landlord or her daughter knew that the pen was inadequate to contain the dogs, or that either had witnessed the dogs attempting to escape from the pen. Therefore, the evidence in this case does not support a reasonable inference that *this* landlord had any knowledge, actual or constructive, of any vicious tendencies or ability to escape from confinement on the part of *these particular dogs.*

Finally, the fact that the landlord required its tenant to bear the responsibility for any harm or damage done by their pets is meaningless. Nearly every commercial and residential lease in effect in Maryland today requires the tenant to bear responsibility for *any harm* done by the activities conducted by the tenant on the demised premises, or to carry insurance to cover any losses arising out of those activities. Hence, the presence of such a lease clause in this case is without particular moment.

Respectfully, the burden on a tort plaintiff in Maryland to show the mischievous propensities of a particular dog is not very high. The plaintiffs in this case could have, but did not, present testimony regarding any threatening or dangerous conduct of the specific dogs in question, whether it be prior to or post the incident in question. *See Moura v. Randall,* 119 Md.App. at 643–44, 705 A.2d 334 (allowing testimony about post-attack conduct of the dog to support inference that dog had vicious tendencies). *See also Moore v. Myers,* 161 Md.

App. 349, 363–65, 868 A.2d 954 (2005) (unleashed and uncon-
fined pit bull that escaped from owner's property); *Hammond
v. Robins,* 60 Md.App. 430, 434–36, 483 A.2d 379 (1984)
(homeowner permitted a dog to leave an enclosed yard know-
ing of dog's propensity to cross the street when unrestrained).
The plaintiffs also could have presented, but did not, expert
testimony based on sound science under Maryland Rule 5–702
about these specific dogs, or possibly even the breed in
general.

Curiously, at oral argument, counsel for the plaintiff were
unable to explain why they did not call to testify at trial either
the police officers who responded to the scene, or the animal
control officers who took control of and, ultimately, euthanized
the dog which attacked the child in this case. Nor did
plaintiffs' counsel explain why they did not present expert
testimony at trial regarding the behavior of the animals in
question.

The General Assembly likely can regulate, or even ban, pit
bulls in the State of Maryland. A municipal corporation likely
can regulate the keeping of pit bulls within their corporate
limits. *Compare City of Toledo v. Tellings,* 114 Ohio St.3d
278, 871 N.E.2d 1152, 1156–59 (2007) (upholding ban) *and Holt
v. City of Maumelle,* 307 Ark. 115, 817 S.W.2d 208, 209–10
(1991) (same) *with Dias v. City of Denver,* 567 F.3d 1169,
1183–84 (10th Cir.2009) (reversing trial court's dismissal of
plaintiffs' claim that municipal pit bull ban violated substantive
due process). But a court of error review has no such
authority to do so under the guise of tort law. Nor may it
judicially notice as a "fact" that all pit bull terriers are
dangerous. These, however, essentially are the consequences
of the majority's decision under the evidence presented at trial
in this case. I would affirm the judgment of the circuit court
which granted a directed verdict against the plaintiffs.